**OTOE AND MISSOURIA TRIBE OF INDIANS**

v.

**The UNITED STATES.**

No. 1–54.

United States Court of Claims.
May 3, 1955.

Luther Bohanon, Oklahoma City, Okl., and Marvin J. Sonosky, Washington, D. C., Bert Barefoot, Jr., and Bohanon & Adams, Oklahoma City, Okl., on the briefs, for appellants.

Ralph A. Barney, Washington, D. C., Perry W. Morton, Asst. Atty. Gen., for appellee.

Wilkinson, Boyden, Cragun & Barker, Washington, D. C., Donald C. Gormley, Washington, D. C., and John M. Murray, Chicago, Ill., on the brief, amici curiae.

Jay H. Hoag, Duluth, Minn., and Lathers, Hoag & Edwards, Duluth, Minn., for Red Lake Band of Chippewa Indians and others, amici curiae.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

These are appeals from decisions by the Indian Claims Commission, Docket No. 11. See 2 Ind.Cl.Com. 335; [1] id. p. 500.[2] The Indians have appealed from the Commission's final determinations in the first, second, fourth, fifth, sixth, and seventh causes of action.[3] The Government has appealed from the Commission's final determinations in the third and fourth causes of action and from the Commission's final determination on offsets.

Subsequent to oral argument on appeal, the Indian appellants moved to vacate the Commission's judgment on the first cause of action and to remand that cause for further proceedings before the Commission in order to permit the Commission to act on a motion there pending concerning this claim. The grounds for the motion herein are changes supervening since the taking of the appeal, and newly discovered evidence. The Government objected to the granting of the motion on the ground, among others, that a decision by this court upholding the Government's contention that no claim involving so-called Indian title land is cognizable under section 2 of the Indian Claims Commission Act, 25 U.S.C.A. § 70a, would render useless a remand of the first claim which concerns such land. Accordingly, we defer action on Indian appellant's motion and shall decide it later in this opinion.

We shall first discuss and decide the Government's overall contention that Congress did not, in enacting the Indian Claims Commission Act, 25 U.S.C.A. § 70 et seq., create any new causes of action, but merely provided a forum in

1. Findings and decision on liability and damages, dated March 31, 1953.

2. Findings and decision on offsets, dated December 11, 1953.

3. The eighth and ninth causes of action requested an accounting of all financial transactions between the parties. These matters were dealt with in a separate hearing on offsets.

which Indian claimants could sue the United States on only those claims concerning which the United States had already consented to be sued by non-Indians.

■■ As pointed out by defendant, the function of recognizing liability in the United States for claims that have no legal or equitable basis under existing law is a political and not a judicial function. We think it is quite clear from the face of the Indian Claims Commission Act that in its passage Congress was, to a certain extent, exercising its political function of creating certain new causes of action and recognizing liability in the United States, if the facts warranted, in connection with such causes. In fact, the Act clearly creates causes of action and permits suit thereon which would not have been possible, and are not possible, as far as we know, between private individuals. In addition, Congress was providing a forum in which these causes of action might be sued on, and also in which the Indians might sue the United States on causes of action available to non-Indians.

Clauses (1) and (2) and portions of clause (3) of section 2 merely provide a forum in which Indians may sue the United States in the same manner as non-Indians, except that Congress expressly waived the defenses of the statute of limitations and laches.[4]

Clauses (1) and (2) provide as follows:
" * * * (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, *with respect to which the claimant would have been enti-*

*tled to sue in a court of the United States if the United States was subject to suit; * * *."* [Italics supplied.]

■ In general, these clauses extend to Indian claimants the benefits of the Tucker Act and the Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq.

Clause (3) provides:
" * * * (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; * *."*

■ Suits for the reformation or revision of *contracts* for fraud, duress, unconscionable consideration and for *mutual* mistake of *fact* are claims on which the claimant might have brought suit in the Federal courts against the United States if the Government were subject to suit. Accordingly, to this extent, clause (3) merely provides a forum for such suits by Indian claimants.[5] On the other hand, contracts may not be reformed for mutual mistake of *law*, or for *unilateral* mistake of law or fact, as provided in this clause. Neither may Federal courts entertain claims requiring the revision of treaties.[6] In these instances, certainly, Congress was creating new causes of action and also was providing a forum in which they might be litigated.

Clause (5) provides: [7]
" * * * (5) claims based upon fair and honorable dealings *that are not recognized by any existing rule of law or equity."* [Italics supplied.]

---

4. Claims arising subsequent to the passage of the Act in 1946 are provided for in section 24 [now 28 U.S.C.A. § 1505], see Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 75 S.Ct. 313, and are subject to all the usual defenses.

5. It would seem that such claims could have been brought under clause (2).

6. Otoe and Missouria Tribes of Indians v. United States, 52 Ct.Cl. 424; Osage Tribe of Indians v. United States, 66 Ct. Cl. 64.

7. We shall discuss clause (4) later in this opinion.

**270**

That the above clause creates a new cause of action against the United States seems too obvious for comment.

In the first four causes of action the Indian appellants sue on claims which would result if certain treaties were revised for unconscionable consideration under clause (3) of section 2 of the Indian Claims Commission Act, or which would result if the Government's actions did not measure up to the standard of fair and honorable dealings, on the part of the United States, under clause (5). All of the treaties and dealings involved in these four claims concern land held by the Indian appellants by so-called Indian title, i. e., exclusive possession, occupancy, and use from time immemorial. It is the Government's position that even if Congress did create new causes of action based on revision of treaties for unconscionable consideration, or on lack of fair and honorable dealings by the United States, there is nothing in the Act which indicates a Congressional intent to *create* a cause of action in the claimant, or to admit the existence of a *liability* in the Government, where the treaty sought to be revised, or the dealings claimed to be unfair, involve land held by the Indian claimants by aboriginal use and occupancy title (Indian title) rather than reservation or treaty title.

This phase of the appeal has been extensively and painstakingly briefed by the parties and by others who have filed helpful briefs *amici curiae*. Following the recent decision of the Supreme Court affirming this court's decision in the case

of Tee-Hit-Ton Indians v. United States,[8] additional briefs were filed concerning the possible applicability of the decision in that case to this issue in the present appeal.

In the Tee-Hit-Ton case the Supreme Court held that "Indian title" interest in land does not give rise in the Indians claiming such title to any rights against the United States under the Constitution or under section 24 of the Indian Claims Commission Act[9] (now codified as 28 U. S.C. § 1505). Nothing in the opinion in that case purports to speak on the question involved in the present controversy, i. e., whether, in enacting section 2(3) of the Indian Claims Commission Act and creating liability in the United States on claims which would result if treaties, etc., between the Indian claimant and the United States were revised on the enumerated grounds, Congress intended to include treaties dealing with Indian-title land; or whether, in enacting clause (5) of section 2, Congress intended to create liability in the United States where it could be shown that the Government acted less than fairly and honorably in its dealings with the Indians in connection with treaties concerning their Indian-title land. While the Supreme Court's decision is not entirely silent on these questions, it is obvious that it did not intend to decide these questions. We shall discuss such references later in this opinion.

In support of their conflicting contentions regarding the legislative intent, both parties have pointed to the language

8. 120 F.Supp. 202, 128 Ct.Cl. 82, affirmed February 7, 1955, 348 U.S. 272, 75 S.Ct. 313.

9. Section 24 of the Indian Claims Commission Act, 60 Stat. 1049, provides in part as follows:
 "The jurisdiction of the Court of Claims is hereby extended to any claim against the United States accruing after the date of the approval of this Act in favor of any Indian tribe, band, or other identifiable group of American Indians * * * whenever such claim is one arising under the Constitution, laws, treaties of the United States, or Executive orders of the

President, or is one which otherwise would be cognizable in the Court of Claims if the claimant were not an Indian tribe, band, or group. In any suit brought under the jurisdiction conferred by this section the claimant shall be entitled to recover in the same manner, to the same extent, and subject to the same conditions and limitations, and the United States shall be entitled to the same defenses, both at law and in equity, and to the same offsets, counterclaims, and demands, as in cases brought in the Court of Claims under section 145 of the Judicial Code (36 Stat. 1136; 28 U.S.C. sec. 250), as amended: * * *."

of the statute, its legislative history, special jurisdictional acts to some extent in *pari materia*, and to various standard rules of statutory interpretation and construction.

The parties have made numerous contentions based on various so-called rules of statutory interpretation and construction: that because the Indian Claims Commission Act is a special jurisdictional act giving consent to sue the United States, it must be strictly construed; that because the Act is essentially remedial it must be liberally construed in favor of the class it was intended to benefit and in the light of the evils it was intended to correct; that the Act is unambiguous on its face and that therefore resort to legislative history to determine its meaning is improper; that although the meaning of the words used may be plain, courts may still look to the legislative history to determine whether giving the words their natural significance leads to unreasonable results plainly at variance with the policy of the legislation as a whole, or to determine whether a certain word or phrase has been employed with a more limited or different meaning than might be attributed to it in common practice; that the failure of Congress to include the specific words, i. e., "Indian title land," requires the conclusion that Congress intended to exclude such words; that unless the language of the statute necessarily excludes certain matters, it may be construed to cover such matters if they come within the spirit or reason of the law, particularly where such coverage does not give the statute a meaning inconsistent with the language used but rather serves to accomplish the purpose of the law and is in harmony with the other provisions of the statute.

Rules of statutory interpretation and construction are not legal maxims or ends in themselves, but are rather aids in discovering the meaning to be attributed to the language employed by the legislature. The application of any particular rule may well be affected by other rules in order to avoid absurd results.

Whether a statute is to be construed strictly or liberally depends on which construction will make the legislative intent and purpose effective. A liberal construction will not justify an extension of the scope of the statute beyond the obvious contemplation of the legislature, even though the statute be purely remedial in nature and the construction proposed will produce a most desirable result. On the other hand, strict construction will not be applied to defeat the clear intention of the legislature or to produce an absurd result, unless absolutely unavoidable.

The Indian Claims Commission Act is both remedial legislation and special legislation. It broadens the Government's consent to suit and as such is in derogation of its sovereignty. It confers special privileges upon the Indian claimants apart from the rest of the community, and to some extent is in derogation of the common law. This was, we think, because of the peculiar nature of the dealings between the Government and Indians from very early times. On the other hand, it remedies defects in the common law and in pre-existing statutory law as those laws affected Indians, and it was designed to correct certain evils of long standing and well known to Congress. Fortunately, under these circumstances, rules of interpretation and construction are subordinate to the principle that the object of all construction and interpretation is the just and reasonable operation of the particular statute, and accordingly it should be possible to construe the statute liberally to affect its remedial purpose and intent, and strictly to limit undue abrogation of fundamental rights or to prevent undue extension of extraordinary remedies.

■■ The Government appellant lays particular stress on the fact that nowhere in clauses (3) and (5) is the expression "Indian title land" employed, and urges that the omission of this expression should not be supplied by the court. Since all mention of "land" is omitted in those clauses, it would seem that a court

would be as little justified in implying that Congress meant to include "reservation title land" or "fee simple title land" as it would "Indian title land." But it manifestly did intend to include land under some title since it is common knowledge that Indian treaties dealt primarily with Indian *land* and usually provided for cessions of such land held both by "Indian title" and "Reservation title" to the United States. Sometimes the land being ceded was land to which the Indians had aboriginal use and occupancy title which, as a matter of policy, the Government preferred to extinguish by formal treaty rather than by arbitrary action or by appropriation. Sometimes the land was held by reservation or treaty title. At other times the treaty in question covered land held by both types of ownership. Since the language of clauses (3) and (5) does not, in so many words, state whether Congress intended to permit the adjudication of claims thereunder where the land involved was Indian title land, we must endeavor to discover by means of both intrinsic and extrinsic aids to statutory interpretation, what Congress did intend.

 One step in the discovery of legislative meaning or intent is the ascertainment of the legislative purpose, i. e., the reasons which prompted the enactment of the law. The purpose of the legislature may well tend to reveal the meaning of the language used by the lawmakers since we assume that the legislators sought to use language which would carry out their purpose rather than to defeat it. In seeking to ascertain the legislative purpose, it is proper to look at the circumstances existing at the time of the enactment of the statute, to the necessity for the law, the evils intended to be cured by it, to the intended remedy, and to the law as it existed prior to such enactment.

From the publication of the so-called Merriam Report [10] in 1928 until the Indian Claims Commission Act of 1946 was enacted, Congress was almost constantly engaged in considering various proposals designed to bring about a settlement of outstanding Indian claims on a fair and equitable basis and in as expeditious a manner as possible. It was generally agreed that settlement of Indian claims by means of suits under numerous special jurisdictional acts was both cumbersome and unsatisfactory. As pointed out by the Secretary of Interior in a letter introduced in the record of Senate Hearings on S. 2731 (June 1935, 74th Cong., 1st Sess.) to create an Indian Claims Commission, most jurisdictional acts were in fact inequitable, and recoveries by the Indians in the Court of Claims on legal and equitable claims under such acts were infrequent, with resulting justifiable dissatisfaction by the tribes and their later return to Congress for further redress. [Hearings p. 4.]

In general the bills introduced in both houses were of two kinds. One type of bill merely extended the general jurisdiction of the Court of Claims to cover suits by Indians. Under these bills, only claims of a legal or equitable nature could

10. The Problem of Indian Administration prepared by the Institute for Government Research at the request of the Secretary of the Interior. See Chapter XIII.

11. H.R. 7963, 71st Cong., 2d Sess., 1930, to create a separate court of claims for Indians which would have jurisdiction to hear and determine claims of Indians under the Constitution, laws or treaties, regulations of an executive department, contract express or implied with the Government, and for damages, liquidated or unliquidated in cases not sounding in tort, "in respect of which claim the tribe would be entitled to redress against the United States" in law, equity or admiralty courts, if the United States were suable. The defense of the statute of limitations was waived.

S. 2164, 76th Cong., 1st Sess., 1939, to amend the Judicial Code in respect to the jurisdiction of the Court of Claims in Indian cases. Sec. 145C of this act provided that until otherwise expressly provided by Congress, no jurisdictional Act authorizing suit by Indians against the United States *theretofore* or *thereafter* filed, should be construed by the court, by reason of its passage, general language, or the legislative or administrative history thereof, to prejudice the na-

be brought against the United States.[11] The other type of bill provided for the settlement of legal and equitable claims and also for the settlement of extra-legal or moral claims having no basis in law or equity.[12]

ture or merits of the claim in any respect, or as a recognition of liability of any kind, or as a determination in any degree of the existence or nature of an alleged act on the part of the United States, upon which the claim of liability is predicated; that instead, all such actions should be determined in accordance with establihsed rules applicable to non-Indians in Federal courts.

S. 3083, 76th Cong., 3d Sess., 1940, was almost identical with S. 2164 above. Extensive hearings were held on this bill which was objected to by the Department of the Interior because it would render a nullity those jurisdictional acts already passed which were intended to afford Indians redress in the Court of Claims for wrongs of a *political* nature.

12. S. 3444 (73rd Cong. 2d Sess., 1934), and S. 1465 (74th Cong. 1st Sess., 1935), provided for the creating of an *Indian Claims Court* for the immediate *settlement by negotiation of* all Indian claims then or thereafter pending before the Court of Claims under special jurisdictional acts. The act provided that the settlements were not to be limited or restricted by technical terms contained in any special jurisdictional act under which the claims were pending, and that the settlement should not be limited by any technical defenses. The Indian Claims Court was to have jurisdiction to reconsider any judgment of the Court of Claims entered within twelve years of the passage of the act and if the Indian Court found that such judgment was not based on a full, fair and complete adjudication of the merits but was based on technical grounds, then the Indian Claims Court might recommend a sum in complete settlement of any claims closed by such judgments. The recommendations of the Court were to be transmitted to Congress for appropriations. Any settlement of other claims reached by the Indian Claims Court were to be referred to the Court of Claims which would render judgments thereon.

H.R. 6655 (74th Cong. 1st Sess., 1935), S. 2731 (74th Cong., 1st Sess., 1935), H.R. 7837 (74th Cong., 1st Sess., 1935), S. 1902 (75th Cong., 1st Sess., 1937), H.R. 5817, (75th Cong., 1st Sess., 1937), and S. 4206 (76th Cong., 3d Sess., 1940), all provided for the establishment of an *Indian Claims Commission* to *investigate* and to determine all facts relative to the following types of claims (1) claims aris-

ing under the Constitution, laws, treaties, etc., [this claim was omitted from some of the bills] (2) contract and tort claims, (3) claims arising from the breach of duty by a Government agent while purporting to act in the name of the United States, (4) "claims under *all* treaties heretofore negotiated between the claimant and the United States *but not formally ratified* or executed by all of the parties thereto" (hereinafter referred to as the "unratified treaties" clause), (5) claims based on *fair and honorable dealings*, (6) claims which would arise if treaties, agreements and contracts between the claimant and the United States were revised on the ground of fraud, duress, *mutual or unilateral mistake whether of law or fact.* The Commission was to make its reports and recommendations to Congress either for direct appropriations or for the passage of special jurisdictional acts referring the claims to the Court of Claims. [Italics supplied.]

S. 4234 (76th Cong., 3d Sess., 1940), S. 4249 (76th Cong. 3d Sess., 1940), S. 1111 (77th Cong., 1st Sess., 1941), S. 4339 (77th Cong., 1st Sess., 1941), and H.R. 4693 (78th Cong., 2d Sess., 1944), all provided for the establishment of an Indian Claims Commission *to hear and determine* all claims against the United States on behalf of the Indians. The types of claims enumerated were the precise ones provided for in the bills discussed in the preceding paragraph (including claims founded on the Constitution, laws, treaties, and Executive orders of the President). The bills varied somewhat with respect to the effect of the Commission's final determinations. The Justice Department objected to the passage of this type of bill because it gave the Commission the power to hear and determine claims based on "extra-legal" or moral grounds, a power Congress usually retains for itself.

H.R. 5569 (78th Cong. 2d Sess., 1944), and H.R. 1198 and H.R. 1341 (79th Cong., 1st Sess., 1945) all provided for the establishment of an Indian Claims Commission to hear and determine claims against the United States on behalf of the Indians. The claims enumerated in these bills differed slightly from those enumerated in the bills discussed in the preceding paragraph. The "revision of treaties" clause contained only the grounds of fraud, duress and mutual mistake; unilateral mistake of law or fact

Beginning with a bill drafted and submitted to the Senate Committee on Indian Affairs during the course of hearings before a subcommittee, 70th and 71st Cong., by the Solicitor of the Department of the Interior, this latter type of bill usually contained provisions which permitted consideration of non-legal or moral claims, including claims which would result if treaties, contracts and agreements between the Indians and the United States were revised on the basis of fraud, duress, mutual or unilateral mistake of law or fact (hereinafter sometimes referred to as the "revision of treaties" clause); claims based on the breach of duty of a Government agent acting within the apparent [13] scope of his authority; claims arising under treaties theretofore negotiated between the claimant and the United States but not formally ratified or executed by all the parties thereto (hereinafter sometimes referred to as the "unratified treaties" clause), and claims based on fair and honorable dealings not cognizable in law or equity.

The first group of bills provided for the settlement by negotiation of all pending claims. The next group of bills provided for the investigation of all claims and reports and recommendations thereon to Congress. The last group of bills provided for the hearing and final *determination* of the same types of claims. The claims provided for in the earliest bills differed little from those included in the various clauses of section 2 of the bill finally enacted into law.

A study of the numerous bills relating to the proposed final settlement of Indian claims, the accompanying House and Senate hearings, the House and Senate Committee reports, and the debates on the floors of both Houses, reveals that in enacting the 1946 Indian Claims Commission Act, Congress had certain well-

was omitted. The "fair and honorable dealings" language was not used and in its place there appeared a clause reading:

"claims of whatever nature which morally exist though not recoverable by law."

These bills contained no clause referring to "unratified treaty" claims.

On June 11, 1945, the Department of the Interior submitted a draft containing its proposed amendments to H.R. 1198. These amendments called for the reinsertion of the "unratified treaty" clause which had appeared in numerous bills in the past; they called for the insertion of grounds appearing in previous bills in the "revision of treaties" clause, i. e., mutual and unilateral mistake of law and fact; and they called for the reinsertion of the old "fair and honorable dealings" language in place of the language "claims of whatever nature which morally exist". On June 14, 1945, the Department of the Interior submitted another draft of H.R. 1198 with additional amendments which included: (1) the substitution of the following language for the old "unratified treaty" clause language:

"claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant."

(2) the addition of "unconscionable con-

sideration" as a ground for revision of treaties.

Later in the hearings, H.R. 4497 (79th Cong., 1st Sess., 1945) was substituted by the House Committee for H.R. 1198 and H.R. 1341, and it included all the last discussed amendments. On July 13, 1946, the Senate Committee on Indian Affairs considered H.R. 4497 (79th Cong., 2d Sess., 1946), with amendments apparently suggested by the Department of Justice. These amendments eliminated the clause concerning "unratified treaties" and lands owned or occupied by the claimants; there was also omitted the "revision of treaties" clause and the clause relating to breaches of duty by Government agents. The bill as amended was passed by the Senate. On disagreement by the House, the bill was referred to a conference of members of both Houses. As a result of this conference, the two Houses agreed to reinsert the "revision of treaties" clause and the clause relating to the taking of land owned or occupied by the claimant, whether by treaty or otherwise. The clause relating to a Government agent's breach of duty was not reinserted. This bill was finally enacted into law.

13. The United States is not ordinarily liable for the unauthorized acts of its agents. Gibbons v. United States, 8 Wall. 269, 19 L.Ed. 453; Whiteside v. United States, 93 U.S. 247, 23 L.Ed. 882.

defined purposes in mind. Congress wished to settle all meritorious claims of long standing of Indian tribes and bands whether those claims were of a legal or equitable nature which would have been cognizable by a court of the United States had the United States been subject to suit and the Indians able to sue, or whether those claims were of a purely moral nature *not* cognizable in courts of the United States under any existing rules of law or equity. Congress was well aware of the fact that before the latter type of claim could be litigated and a judgment secured, it would be necessary for Congress to take the necessary political action of creating a cause of action and recognizing liability in the Government for the wrong implicit in the cause if facts sufficient to establish the cause provided for were presented by the Indian claimant. Consideration of language which would do precisely that was begun in 1928 and culminated in the enactment of clauses (3), (4) and (5) of the Indian Claims Commission Act in 1946. Efforts to prevent the enactment of a bill which would give the Indian Claims Commission jurisdiction to adjudicate and award judgment on claims having no basis in existing rules of law or equity, met with ultimate failure [14] and the purpose of the majority of the legislators to permit the adjudication of such claims is manifest in the clear language of section 2 of the act as passed.

We next consider the narrower problem of determining whether or not Congress intended to include in clauses (3) and (5) of section 2 of the Act, claims concerning alleged wrongs to Indian claimants in connection with land held by them under Indian title rather than under fee simple or reservation title. As pointed out earlier in this opinion, the word "land" is not mentioned in either clause, and yet no one suggests that because a particular treaty or course of dealings dealt with *land* the treaty is not subject to revision under clause (3), or the dealings cannot be scrutinized under the fair and honorable dealings criteria of clause (5). Government appellant does say, however, that when Congress used the term "treaties" in clause (3) it did not mean to include *all* treaties, but only certain ones, i. e., treaties relating to land held by the claimants under fee simple or reservation title; and that when Congress used the word "dealings" in clause (5), it did not mean all dealings, but rather it meant to exclude from consideration any dealings relative to the claimant's Indian title land. Indians can obtain a reservation title by treaty, statute or agreement.

Since both "treaties" and "dealings" between the Government and the Indians covered numerous subjects including land, it may be said that those words as used in clauses (3) and (5) are general terms. It is true that a court in interpreting a provision in a statute may imply an exception to general terms used therein, but it will do so only where to apply the general term literally would lead to absurd results, contrary to the manifest Congressional purpose as revealed by the statute as a whole and as confirmed by its legislative history. Cf. Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413; Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226.

In the absence of legislative direction to do so, Federal courts cannot consider claims relative to Indian title land. Congress must first create a cause of action and recognize liability in the Government on it, or the court is powerless, under the law as it exists, to adjudicate a claim concerning Indian title land and render judgment thereon in favor of the claimant.[15] In providing for the adjudication of claims which would arise from the revision of treaties or on the basis of fair and honorable dealings, however,

14. See footnote 11, supra, in connection with S. 2164, 76th Cong., 1st Sess., 1939, S. 3083, 76th Cong., 3d Sess., 1940, and the Senate amendments to H.R. 4497

(79th Cong., 1st Sess., 1946) discussed in footnote 12, above.

15. The Tee-Hit-Ton Indians v. United States, supra.

Congress *was* creating causes of action and admitting a liability in the Government on such claims. The question is then, do these newly created causes of action extend to claims falling within their general terms including claims based on property rights in the Indians that are not compensable or justiciable under ordinary rules of law or equity.

In the instant case the literal meaning of clauses (3) and (5) does not require the exception urged by Government appellant. Giving the word "treaties" used in clause (3) its natural significance would result in our finding that Congress intended that *all* treaties were to be included regardless of whether those treaties dealt with Indian title or reservation title land, or, in fact, with no land at all. Nothing in the language of clause (5) indicates a Congressional intent to exclude from its coverage "dealings" relating to Indian title land of the claimant.

▇ The court should give the statute the plain meaning indicated by its language unless that meaning is clearly at variance with the legislative purpose as manifested by the whole act and confirmed by the legislative history, in which latter event the court would be justified in following the purpose rather than the literal meaning of the portions of the statute under consideration. Chatwin v. United States, 326 U.S. 455, 464, 66 S.Ct. 233, 90 L.Ed. 198; United States v. American Trucking Associations, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345.

Having concluded that a literal reading of clauses (3) and (5) requires the inclusion of claims relating to Indian title land, we next consider whether that interpretation is consistent with other provisions in the statute in the light of the language used in those other provisions, and also in the light of the legislative purpose motivating the passage of the act as a whole.

The word "land" is used only once in section 2 and that is in clause (4) which provides as follows:

" * * * claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, *of lands owned or occupied by the claimant* without the payment for such lands of compensation agreed to by the claimant; * * *." [Italics supplied.]

Clause (4) not only mentions land specifically, but it characterizes the kinds of property interests intended to be included as (1) land owned, and (2) land occupied. The legislative history of the act is replete with evidence that Congress was acutely aware of the fact that Indians held land in two general ways: (1) by virtue of aboriginal use and occupancy from time immemorial, i. e., by Indian title, and (2) by reservation or treaty title, sometimes known as "recognized" title. Congress was also well aware of the fact that "Indian title" created in the holders of such title no legal rights against the sovereign, and that its extinguishment by the sovereign through solemn treaty for a consideration, was the result of a long standing policy rather than because of any legal obligation in the sovereign to do so. Both from the language of clause (4) and its legislative history which we shall discuss later, we are of the opinion that Congress intended that Indian claimants should have a cause of action and should be entitled to recover the value of the Indian title lands which had been taken by the Government without the payment of compensation therefor, whether the Government acquired that land by ratified treaty of cession, or whether the land was taken without the formality of a treaty, even an unratified one.

If clause (4) permits Indian claimants to recover for the uncompensated taking (deprivation) by treaty or otherwise of a property right which in itself created no legal right in the owner against the Government, it would seem reasonable to conclude that Congress also intended that the same property right ceded under a ratified treaty of cession for a grossly inadequate consideration, would give rise to a cause of action under

clause (3); and also, that where the Government's dealings with Indians concerning that same property right were less than fair and honorable, the Indians should have a claim under clause (5). A study of the legislative history of the Act as a whole and of those three clauses in particular, persuades us that Congress did so intend.

In June 1935, during the course of hearings on S. 2731 before the Senate Committee on Indian Affairs, the Assistant Solicitor of the Department of the Interior testified as follows:

"Congress does not appear to learn that a great many claims cannot be settled by the Court of Claims but only by political action, in spite of the fact that all the many claims which sought relief from fraud, duress, or mistake of fact, and which have been sent to the Court of Claims were dismissed for want of jurisdiction." [Hearings, pp. 10, 11.]

As examples of the type of claim that had been rejected by the court as beyond its power to adjudicate, the Solicitor cited, among others, Otoe and Missouria Tribes of Indians v. United States, supra, which involved claims based on the payment of unconscionable consideration under a treaty of cession of land held by the Indians by Indian title, and Sisseton and Wahpeton Band of Sioux Indians v. United States, 1923, 58 Ct.Cl. 302, affirmed 277 U.S. 424, 425, 48 S.Ct. 536, 72 L.Ed. 939, involving a claim based on mistake and misrepresentation as to the acreage of Indian title land ceded to the United States by a ratified treaty of cession. The other cases mentioned by the Solicitor involved claims requiring revision of treaties covering reservation title land.

The extra-legal claims over which the Commission was to be given jurisdiction in S. 2731 included (1) claims arising from breach of duty of a government agent acting within the apparent scope of his authority, (2) claims based on *unratified* treaties which had been negotiated between the United States and the Indian claimants, (3) claims based on fair and honorable dealings, and (4) claims which would result if treaties, etc., were revised for fraud, duress, or mutual or unilateral mistake of law or fact.

H. R. 7837 (74th Cong., 1st Sess., 1935) was an almost identical bill considered by the House Committee on Indian Affairs. The Commissioner of the Bureau of Indian Affairs testified in favor of the bill and made the following statement in connection with the problems which the bill was designed to solve:

"Ever since the beginning of the history of our Government in Indian Affairs the Government has been entering into treaties with Indian tribes and having these treaties, either by agreement or unilateral action, and in later years supplementing them with agreements. Again, it has been acting as the guardian of the Indians in the absence of treaties. It has been recognizing the Indian title to areas of land, extinguishing the Indian claim of title to other areas, and having recognized title repeatedly the Government has changed its mind and altered and diminished them. * * *

"Now, out of this total of the past record, extending down to this day, there have grown up innumerable grievances and claims, in some instances resting upon grounds which are definitely legal or ethical (sic) and therefore can be settled in the Court of Claims, that is if they can get passed a jurisdictional act and if the act is drafted with a knowledge of the necessary facts then the case may be settled in the Court of Claims equitably.

"A considerable number of the claims and grievances do not grow out of legal facts but essentially out of the moral parts of the record. There are a great many valid Indian claims, valid humanely and morally, but such have no basis in law. * * *" [House hearings pp. 5 and 6.]

In 1937 Congress was considering S. 1902 (75th Cong., 1st Sess.) which was almost identical with S. 2731 and H. R. 7837. At page 3220 of the Congressional Record—Senate, April 7, 1937, Senator Thomas made the following statement concerning S. 1902:

"The reason for the bill is the long delay in the consideration of Indian claims before the Court of Claims. In 1927 a measure was enacted giving the California Indians the right to go into court and present their claims. Their case has been pending since 1927. The case was filed by the Attorney General of California, but it is not being prosecuted; nothing is being done. *It is to help Indians of that class that the measure before us is being urged.* * * *" [Italics supplied.]

On June 23, 1937, the same bill was considered by the House. Speaking in favor of the bill, Representative Dimond stated:

"And the case of the California Indians is only an example of what has gone on and is going on all over the country with respect to many of the Indian citizens. Some other measure might be proposed which would work out to better advantage both for the Government and for the Indians, but no such measure is now before us and we all know the difficulties that would be encountered in drafting such a bill and having the same presented and considered." [Congressional Record—House, p. 6251.]

The claims of the California Indians were well known to the Congress. The Government had, in the last century, negotiated some eighteen treaties with certain of those Indians pursuant to which the Indians agreed to cede to the United States lands claimed by them under Indian title. In reliance on those treaties, the Indians left their land. The treaties were never ratified and the Indians were paid nothing for the land involved. Other California Indians, not parties to the treaties, were deprived of their land which was taken by the Government without the payment of any compensation. As indicated above, Congress supposed that the claims of these Indians could be settled under the provisions of the bills then under consideration. The hearings and debates do not mention, in the earlier years, under precisely which provision of the bills those claims could be considered, but the claims of the unratified treaty Indians would seem to fall within the meaning of the following clause which appeared in nearly every bill introduced to settle extra-legal claims from 1935 through 1944: [16]

"* * * claims under all treaties heretofore negotiated between the claimant and the United States but not formally ratified or executed by all of the parties thereto; * * *."

In 1940 there was under consideration S. 3083 (76th Cong., 3d Sess.) to amend the jurisdiction of the Court of Claims to permit Indians to sue therein. It contained a provision that no jurisdictional act theretofore or thereafter passed should be construed by the court to prejudge the nature or merits of a claim in any respect, or to amount to a recognition of liability of any kind, nature or character, in the Government. The Department of Justice explained that this provision was designed to assure that no special jurisdictional act in behalf of Indians could be held by the court to create a right but only to provide a forum for rights recognized under existing rules of law and equity. The Department of the Interior seriously objected to this provision and in a report explain-

16. H.R. 6655 (74th Cong., 1st Sess., 1935); S. 2731 (74th Cong., 1st Sess., 1935); H.R. 7837 (74th Cong., 1st Sess., 1935); S. 1902 (75th Cong., 1st Sess., 1937); H.R. 5817 (75th Cong., 1st Sess., 1937); S. 4206 (76th Cong., 3d Sess., 1940); S. 4234 (76th Cong., 3d Sess., 1940); S. 4349 (76th Cong., 3d Sess., 1940); S. 1111 (77th Cong., 1st Sess., 1941); S. 4339 (77th Cong., 1st Sess., 1941); H.R. 4693 (78th Cong., 2d Sess., 1944).

ing its position it made the following statement:

"* * * it is appropriate and essential in some types of claims for Congress to recognize a liability by the passage of a jurisdictional act. These types of claims are not those based on the violation of any law, treaty, or agreement of the United States but based upon that sort of injury which the Court of Claims has described as political rather than judicial in nature. Among such claims are (a) Claims based on the taking without compensation of the *aboriginal right of use and occupancy of land,* the ownership of which by the Indians was never formally recognized by the Government * * *." [Italics supplied.] [Senate Hearings p. 22]

"The legislative history of the California jurisdictional bill indicates that Congress was repeatedly advised of the lack of a strictly legal or equitable basis for the claims and that recovery for the claims, morally compelling, must depend on the exercise by Congress of its political function of recognizing liability for such claims." [Senate Hearings p. 23]

There was general agreement at the hearings that S. 3083 would prevent the Court of Claims from considering any claim arising out of an Indian title interest in land, or any other so-called extra-legal or moral claim, and that its passage would make a nullity of any ju-risdictional act then pending or later enacted which permitted suits on such moral claims. The bill was not passed.

In the summer of 1940, Senator Thomas introduced two bills providing for the creation of an Indian Claims Commission (S. 4234 and S. 4349, 76th Cong., 3d Sess.), to hear and determine claims of the same type as those specified in numerous similar bills considered from 1935 up to that time. In 1941, another almost identical bill was introduced—S. 1111. This bill provided that the Commission's final determination should, when reported to Congress, have the effect of a final judgment of the Court of Claims and be paid in like manner. The Department of Justice objected to the passage of the bill for the following reasons, among others:

"The provision in question might therefore have the effect of making the Commission not a fact-finding body authorized to report its conclusions to the Congress, but virtually a court with the power to determine claims based upon extra legal and moral grounds. Such a result might have the effect of a surrender by the Congress of its very necessary prerogative to sift and control this unusual type of claim against the Government." [Letter from Acting Attorney General Francis Biddle, June 12, 1941, appearing at page 6 of Report No. 909 of the Senate Committee on Indian Affairs to accompany S. 1111.] [17]

---

17. The Department of Justice had not objected seriously to earlier bills which had merely authorized the Commission (1) to settle by negotiation or (2) to investigate and report to Congress with recommendations, claims of an extra-legal or moral nature, including, among others, claims involving Indian title land. It did object, however, to any bill which would create causes of action on such claims, admit liability in the Government thereon, and give to the Commission or Court the power to render money judgments thereon. In the early years, Congress had no idea of authorizing a Commission to award judgments on purely moral claims. Its purpose was to have the Commission investigate those claims, make findings thereon and report to Congress its recommendations for the disposition of such claims. It was thought that such an arrangement would expedite the handling of Indian claims and would provide a way for more equitable and generous settlement of long-standing grievances on the part of the Indians than did the old system of procuring the passage of special jurisdictional acts. It was finally decided, however, that the most satisfactory and expeditious manner of settling both legal and extra-legal claims of the Indians was to give a Com-

In the 78th and 79th Congresses (1944 and 1945), three additional bills were introduced in the House (H. R. 5569, 78th Cong., 2d Sess., 1944, H. R. 1198 and H. R. 1341, 79th Cong., 1st Sess., 1945). These bills differed from previous bills in that the "revision of treaties" clause contained only the grounds of fraud, duress, and mutual mistake and omitted unilateral mistake and mistakes of law. The usual "fair and honorable dealings" language was also omitted and in its place there appeared a clause reading: "Claims of whatever nature which morally exist though not recoverable by law." The bills contained no clause relating to claims under "unratified treaties."

In March 1945, the House Committee on Indian Affairs held hearings on H. R. 1198. The Assistant Commissioner of the Bureau of Indian Affairs testified in favor of the bill. He stated that most of the claims that would be brought under the bill would involve the failure of the Government to live up to its obligations incurred under treaties, and the failure of the Government to protect lands "reserved by the Indians and recognized by treaty." He then stated that another sort of claim was included in the bill's coverage:

"Then too, another set of claims arise from the taking by the Government of lands belonging to the Indians, and without making compensation. Now those lands may have been recognized by treaty or they may not have been recognized by treaty, or the treaty may not have been ratified, as in the case of the California Indians, for instance." [House Hearings, p. 60.]

The Commissioner stated that in his opinion, one of the first cases that would be brought to the Commission, if it were created, would be the case of the California Indians.

The Department of the Interior submitted a draft containing its proposed amendments to H. R. 1198. These amendments provided for the reinsertion of the "unratified treaty" clause which had appeared in previous bills; the "revision of treaties" clause was expanded to include mutual and unilateral mistake of law and fact as had previous bills; the old "fair and honorable dealing" language was reinserted in place of the language "claims of whatever nature which morally exist." The Department's explanation of the proposed changes was as follows:

"The suggested amendments to the first paragraph of this section * * * are for the purpose of defining more exactly the principal classes of Indian tribal claims that might be considered by the Indian Claims Commission. Unratified treaties have been involved, either affirmatively or as a matter of defense, in a number of Indian claims. Instances also exist of claims founded upon unilateral mistakes or upon mistakes of both law and fact. The language 'fair and honorable dealings', when applied in conjunction with the other standards established by this section, would provide a yardstick for the adjudication of moral claims." [House Hearings p. 116.]

On June 14, 1945, further amendments to H. R. 1198 were proposed by the Department of the Interior. The ground of "unconscionable consideration" was added to the "revision of treaties" clause. The "unratified treaty" language that had appeared in so many previous bills and had been reinserted in H. R. 1198

mission the authority to hear and determine such claims and to render judgments thereon which would be final and would be paid in the same manner as are judgments of the Court of Claims. It was felt that this would relieve Congress of the burden of studying the findings and recommendations of a mere fact-finding Commission and of later passing legislation appropriating money to pay claims deemed meritorious, or legislation referring others involving law questions to the Court of Claims.

on June 11, was omitted and the following language substituted:

"Claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant."

These changes were explained as follows:

"The changes of phraseology in clause (3) [revision of treaties clause] would give fuller expression to its [Congress'] apparent intent of placing treaties and agreements between the Government and Indian tribes on the same footing with contracts between the Government and non-Indians, insofar as necessary to permit application of the recognized equitable principles under which contracts may be reformed or set aside for fraud, duress, unconscionable consideration, mistake, and kindred wrongs. Additional [sic] of the new clause (5) [the unratified treaty clause substitute] would give express recognition to one of the most clearly just and grievously resented classes of claims, that growing out of the scattered instances where lands peaceably held under an uncontested Indian title have been expropriated without an act of cession on the part of the Indians, or where the Government has retained ceded land notwithstanding its failure to ratify or carry out the terms of the cession. * * *" [House Hearings p. 141.]

At that time the Committee was fully aware of the fact that a number of special jurisdictional acts were then pending and it was the hope of Congress that passage of the Indian Claims Commission Act would render unnecessary the passage of those special acts. There was prepared and presented to the Committee a list of such tribal claims tentatively formulated but not prosecuted, in connection with which special jurisdictional acts were then awaiting Congressional action. Among them was an act for the Snake or Piute Indians of the Former Malheur Reservation and the land in connection with which that tribe was making its claim was land in which the tribe had only Indian title.

H. R. 4497 was substituted for H. R. 1198 and, on May 20, 1946, this bill was debated and passed by the House of Representatives. In the course of the debate, a letter of the Attorney General, was read into the record. In the course of that letter the Attorney General made the following statement:

"With respect to section 24, which in effect provides for a general jurisdictional act for all legal claims of Indian tribes arising in the future, I may say that the primary purpose of establishing an Indian Claims Commission, as I understand, is to furnish redress to the Indian tribes with respect to claims arising against the United States during the period of the settlement and expansion of the country. Most of these claims, I assume, are of a moral character and are not based upon legal principles. Thus, the problems presented by the proposal made in section 24 are quite different from those dealt with in the remainder of the bill. * * *" [Congressional Record—House, May 20, 1946, p. 5311.]

The Attorney General stated that he was unable to recommend enactment of the bill.

In June 1946, the Senate Committee on Indian Affairs commenced hearings on H. R. 4497. The Committee members and those testifying, all agreed that the clause providing for claims arising from the taking of lands owned or occupied by the claimant, by treaty or otherwise (then clause (5), later renumbered (4)), would permit suit by both the treaty and non-treaty California Indians for the taking of their Indian title lands. The word "taking" here used with reference to "Indian title" land was obviously not used to denote a taking in the constitutional sense.

On July 13, 1946, the Senate Committee met to consider amendments to H. R. 4497 proposed by the Department of Justice. The proposed amendments eliminated the revision of treaties clause, the clause relating to breaches of duty by a Government agent, and the clause relating to the taking of land owned or occupied by the Indians, by treaty or otherwise (the clause substituted by the House for the old "unratified treaty" clause). The Department of Justice representative explained that the clauses eliminated would have created liability in the United States whereas the other clauses did not, but merely provided a forum for legal claims. With respect to the fair and honorable dealings clause, the Department's representative stated his position to be that a claim could be maintained under that clause only with respect to land where the land held was reservation land, and not if the land was held by Indian title. The representative of the Department of the Interior suggested that the amendments proposed by Justice, when viewed in connection with the legislative history, might be interpreted to mean that the bill as amended by the Senate was intended to give Indian claimants less than the House bill gave them. The Committee Chairman indicated that this was not the case and that the Senate Committee Report would contain a statement to that effect. The Senate Report 1715 did contain a statement that the amendments were designed for the sake of clarification only and were *not* intended to exclude from consideration of the Commission those claims which the House intended to include. However, the Senate Report also stated that the bill, as amended by it, represented the Committee's intent to provide only a forum for the Indian claimants to assert their claims and not to prejudge particular claims against the Government. H. R. 4497 as amended by the Senate was passed by the Senate on July 17, 1946.

The House of Representatives refused to agree to all the Senate amendments and the bill went to conference. On July 27, 1946, Conference Report No. 2693 was issued. This report reveals that the conferees of both Houses agreed to reinsert the "revision of treaties" clause and the "unratified treaties" clause in the same form passed by the House. The House agreed to the Senate's amendment omitting the clause relating to the unauthorized acts of the Government's agents. The Conference Report, as was customary, did not state the *reasons* for the reinsertion of the clauses, but the Statement of the Managers on the part of the House contained the following explanation:

"The bill, as passed by the House of Representatives, enumerated six classes of claims cognizable by the Commission. The Senate, in the interest of simplicity, reduced these to three, being careful to state in its report, that the change was not intended to deprive the claimants of the right to invoke the jurisdiction of the Commission in any case which would have been cognizable under the language of the bill as it passed the House. Out of an abundance of caution the conferees reinserted two of the classifications struck by the Senate *because they wanted to make sure that if any tribal claimant could prove facts sufficient to make a case under either of these classifications, the Commission would have authority to make an award to such claimant.*

"The first of these classifications, consisting of 'claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity' is aptly explained in the report of the House committee.[18] The second of these classifications covers claims arising from the taking by the United States

18. See page 11 of House Report No. 1466, 79th Cong., 1st Sess., dated December 20, 1945.

of Indian lands, i. e., lands to which tribal claimants had 'Indian title' or the 'right of occupancy.' Sometimes these lands were taken under the guise of unratified treaties, sometimes without any semblance of a treaty. The reinsertion of this classification makes it plain that where claimant can prove sufficient facts within the language of this classification the Commission has full authority to award proper damages therefor.

"Both of the classes of claims reinserted by this amendment may fall within the category of 'fair and honorable dealings.' To set them forth explicitly helps to clarify the contents of that category." [Italics supplied.]

The statement sets forth that the clause permitting claims on account of breach of duty by an agent of the United States while acting within the apparent scope of his authority was not reinserted because it was felt this claim was sufficiently covered by general law and by the other enumerated causes of action.[19]

From the above it appears that the last efforts to enact an Indian Claims Commission Act which would merely provide a forum for suit on legal claims and would eliminate the possibility of the Indians suing for and recovering on extra-legal or moral claims, involving, among other things, their Indian title land, met with failure. The legislative history of the Act establishes that from the beginning in 1928, certain members of Congress desired the enactment of a bill which would settle extra-legal or moral claims of Indians against the United States, including claims based on their Indian title property right in land which the Government had either taken without the formality of a treaty, or which the Government had acquired under ratified treaties procured by fraud, duress, unconscionable consideration, etc., or concerning which the Government had been guilty of dealings less than fair and honorable. This desire on the part of certain members of Congress became the desire of the majority of Congress and, with the passage of the Act in 1946, became the legislative intent expressed in clauses (3), (4) and (5) of section 2.

This meaning, or legislative intent, revealed by the legislative history, merely corroborates the literal meaning of those clauses and renders them consistent with

---

19. Government appellant stresses the fact that the Statement of the Managers on the Part of the House concerning the Conference Report was not read in the Senate when the Conference Report was called up and voted on. Under the House Rules a conference report may not be received by the House without a written statement signed by a majority of the House conferees, in sufficient detail to inform the House of the effect of the amendments contained in the Conference Report. Rule XXIX, House Manual, H. Doc. 810, 79th Cong., 2d Sess., p. 441, in effect during the 79th Congress. The Senate rules did *not* require a statement of its conferees and it was not customary or necessary for the statement of the House conferees to be read in the Senate in connection with the Conference Report. The Statement of the House Managers is as much a part of the legislative history of an act as is the Conference Report to which it relates. Contrary to the Government's contention, the Statement of the House Managers was not contrary to the Conference Report. In the first place, the Conference Report did not attempt any interpretation of the amendments agreed to but merely reported what they were. The Statement of the House Managers explained the reason for the amendments and the effect of those amendments. The Government's reference to Blackfeet and Gros Ventre Tribes of Indians v. United States, 119 F.Supp. 161, 127 Ct.Cl. 807, is inapposite in this connection because the court was there concerned with the *supplemental* Statement of the Managers on the Part of the House, which, it is conceded, was not read to the House when it voted on the Conference Report, and which, on the issue of the defense of *res judicata*, was in conflict with the Statement which *was* read in the House. It so happens that the Supplemental Statement does not conflict with the original Statement in respect to the meaning of clauses (3) and (5), or the reasons for their reinsertion in the bill finally enacted.

each other and with the legislative purpose also revealed in the Act's language and its history.

The Supreme Court has not yet considered or decided the issue just discussed, but in a recent decision it has, we think, indicated a view consistent with the view we take concerning the coverage of section 2 of the Act with respect to claims concerning Indian title land. The claim asserted in The Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 75 S.Ct. 313, arose under section 24 of the Indian Claims Commission Act as codified by 28 U.S.C. § 1505. Section 24 merely extended to Indian claimants the same rights to sue the United States in the Court of Claims as are possessed by non-Indians. Section 1505 provides:

"The Court of Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Claims if the claimant were not an Indian tribe, band or group." (63 Stat. 102.)

The Court held that a claim for just compensation under the Fifth Amendment to the Constitution for the taking by the United States of Indian title land held by Alaska Indians was not justiciable under the above quoted law because Indian title was not such a property interest as would give rise to a cause of action under existing rules of law or equity. In discussing the nature of the petitioner's claim, the Court stated at page 273 of 348 U.S., at page 314 of 75 S.Ct.:

"This is not a case that is connected with any phase of the policy of the Congress, continued throughout our history, to extinguish Indian title through negotiation rather than by force, and to grant payments from the public purse to needy descendants of exploited Indians. The legislation in support of that policy has received consistent interpretation from this Court in sympathy with its compassionate purpose."

Footnote 2 to the above statement first cites the Indian Claims Commission Act as an example of the legislation in support of the described policy. It also cites Worcester v. Georgia, 6 Pet. 515, at page 582, 8 L.Ed. 483. At the page to which the court refers, the following statement appears:

"The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense."

The court next refers to pages 87 and 89 of Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, at pages 41 and 42, 63 L.Ed. 138, where the following language appears:

" * * * The question is one of construction—of determining what Congress intended by the words 'the body of lands known as Annette Islands.'

"As an appreciation of the circumstances in which words are used usually is conducive and at times is essential to a right understanding of them, it is important, in approaching a solution of the question stated, to have in mind the circumstances in which the reservation was created—the power of Congress in the premises, the location and character of the islands, the situation and needs of the Indians and the object to be attained. * * *

"This conclusion has support in the general rule that statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expres-

sions being resolved in favor of the Indians. Choate v. Trapp, 224 U. S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941, * * *."

The Court then refers to page 354 of United States v. Santa Fe Pacific R. Co., 314 U.S. 339, 62 S.Ct. 248, at page 255, 86 L.Ed. 260, on which page the following language appears:

"But an extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards. As stated in Choate v. Trapp, 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941, the rule of construction recognized without exception for over a century has been that 'doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith.'"

Later in its opinion in the Tee-Hit-Ton case, 348 U.S. at pages 281, 282, 75 S.Ct. at page 318, the Court stated:

"No case in this Court has ever held that taking of Indian title or use by Congress required compensation. The American people have compassion for the descendants of those Indians who were deprived of their homes and hunting grounds by the drive of civilization. They seek to have the Indians share the benefits of our society as citizens of this Nation. Generous provision has been willingly made to allow tribes to recover for wrongs, as a matter of grace, not because of legal liability. 60 Stat. 1050."

The Indian Claims Commission Act of 1946 begins on page 1049 of 60 Stat. On page 1050 appears section 2 of that Act, under clauses (3) and (5) of which Indian appellants in the instant case are suing.

Under all the circumstances discussed above, we can find no valid reason for implying the exception to clauses (3) and (5) urged by Government appellant and holding that the words "treaties" and "dealings" used in those clauses were not intended by Congress to include treaties and dealings concerning Indian title land. We accordingly hold that the Commission had jurisdiction to hear and determine and make final awards in connection with Indian appellant's claims involving Indian title land under clauses (3) and (5) of the Act, and the Commission's holding to this effect is affirmed.

We shall now consider the several issues raised on the appeals from the Commission's final determinations on the seven causes of action.

### First Cause of Action

This cause of action is urged under section 2(3) or, in the alternative, under section 2(5) of the Indian Claims Commission Act. Indian appellants allege that because of duress and for an unconscionable consideration, they ceded their land to the United States under three treaties, i. e., Treaty of July 15, 1830, 7 Stat. 328, Treaty of October 15, 1836, 7 Stat. 524, and Treaty of March 15, 1854, 10 Stat. 1038. In the alternative, Indian appellants allege that the Government's dealings with them in connection with the land ceded were not fair and honorable.

The Commission dismissed the first case of action on the ground that there was no substantial proof in the record that the claimants actually and exclusively occupied and possessed at any time, any definite and ascertainable portion of the land ceded. The Commission found (finding 6) that at the time of the 1830 treaty, the lands described in Article 1 of the treaty were used, occupied, and hunted over by a number of Indian tribes, including those who were parties [20] to the treaty, but that no one tribe

20. Sacs and Foxes, Medawah-Kanton, Wahpacoota, Wahpeton and Sissetong Bands or Tribes of Sioux, Omahas, Ioways, and claimants.

had exclusive possession of any definite area thereof.

On March 1, 1955, the Indian appellants filed a motion in this court asking the court to vacate the determination of the Indian Claims Commission dismissing the first cause of action and to remand the case so far as that cause of action is concerned, in order to permit the Commission to act on a motion pending before it filed by the Otoe and Missouria Tribe, to determine its claim concerning the land ceded by the Treaty of July 15, 1830, supra, on the basis of the record in the case of Iowa Tribe, v. United States, Docket 138, and the record relating to the first cause of action in the instant case. It is Indian appellants' position that evidence adduced in the Iowa case from the testimony of one of the Government's expert witnesses, has a direct bearing on the claims asserted by the Otoe and Missouria claimants in the first cause of action herein and that its consideration by the Commission might well lead to a determination favorable to the claimants herein on the first cause of action.

In opposing the motion, the Government does not contend that the record before the Commission on the claimant's first cause of action was a complete record, but it says that the material bearing on that claim and presented to the Commission in the Iowa case was as available to the Otoes as it was to the Iowas or to the Government through whose witness it was adduced.

If this were ordinary adversary litigation, we should be inclined to deny the motion. However, as we pointed out in the case of Pawnee Indian Tribe of Oklahoma v. United States, 109 F.Supp. 860, 124 Ct.Cl. 324, Congress was desirous that these claims be "cleaned up" and decided on the fullest possible records and to that end it went so far as to provide for the establishment of a Division of Investigation within the Commission to make, where necessary, an independent search and investigation into the facts and make available to the parties any data so discovered. In the Pawnee case the facts and data on the basis of which the court remanded the case to the Commission for further consideration, were not called to the attention of the court or the Commission by either of the parties. In the instant case, the claimants have called the attention of the Commission and this court to data which, it appears, does have some material bearing on the first cause of action. It is true, as pointed out by the Government, that claimants could have, with the exercise of diligence, developed these facts and presented them to the Commission at the time of the trial, and we are not excusing counsel for failure to do so, but we cannot ignore the emphasis placed by Congress on the necessity that these cases be settled finally on the most complete records available to insure that at some later date the claimants will not again press Congress for special legislation to permit the litigation of matters not fully explored. Since we find it necessary to remand the case on another issue, we shall accordingly allow Indian appellants' motion to vacate the Commission's final determination in the first cause of action and remand the cause for further proceedings.

### Second Cause of Action

This cause of action is urged under clauses (3) and (5) of section 2 of the Act, and is concerned with Articles X and XI of the Treaty of July 15, 1830, supra, and the Government's actions in connection with the subject matter of those articles.

Article X provided in part as follows:

"The Omahas, Ioways and Ottoes, for themselves, and in behalf of the Yanckton and Santie Bands of Sioux, having earnestly requested that they might be permitted to make some provision for their half-breeds, and particularly that they might bestow upon them the tract of country within the following limits, to wit; * * * it is agreed that the half-breeds of said Tribes and Bands may be suffered to occupy said tract

of land; holding it in the same manner, and by the same title that other Indian titles are held: but the President of the United States may hereafter assign to any of the said halfbreeds, to be held by him or them in fee simple, any portion of said tract not exceeding a section, of six hundred and forty acres to each individual. And this provision shall extend to the cession made by the Sioux in the preceding Article."

Article XI provided:

"The reservation of land mentioned in the preceding Article having belonged to the Ottoes, and having been exclusively ceded by them; it is agreed that the Omahas, the Ioways and the Yanckton and Santie Bands of Sioux shall pay out of their annuities to the said Ottoe Tribe, for the period of ten years, Three hundred Dollars annually; of which sum the Omahas shall pay one hundred Dollars, the Ioways one hundred Dollars, and the Yanckton and Santie Bands one hundred dollars."

The Commission found that the United States had not requested or suggested that the Otoes cede any part of their lands to the halfbreeds, but that it merely acceded to the desires of the Indians and thereafter acted as trustees for the halfbreeds, holding and allotting the major portion of the lands to them as provided in the treaty. The lands were allotted and patents issued to the halfbreeds, and the Otoes received the $3,000 stipulated in the treaty from the other tribes.

In making the survey of the lands ceded to the halfbreeds, the Government surveyor made an error excluding some 15,697 acres from the area called for by the terms of the treaty. When an 1855 resurvey disclosed this error, Congress authorized an adjustment for the shortage by payment to such halfbreeds at the rate of $1.25 per acre for the deficiency. Indian appellants contended that some 45 acres of halfbreed land were never allotted. The Commission made no finding on this portion of the claim.

Indian appellants contended that the 3.26 cents per acre they received for the land ceded for the benefit of the halfbreeds of other tribes was so inadequate as to be unconscionable. It is urged that the Government, as guardian for the Indians, owed them the duty of preventing them from disposing of their land at such a price, particularly since the Otoes owed no duty whatsoever to the halfbreeds of the other tribes; that fair and honorable dealings require that the Otoes be reimbursed for the true value of all lands ceded which were for the benefit of halfbreeds of other tribes. Indian appellants also contend that in so far as the Government failed to assign lands erroneously omitted by the survey, the purpose of the cession of those 15,697 acres failed and such lands should have been held by the Government as trustee for the Otoes who should have been paid the true market value of those lands.

The Commission dismissed this cause of action on the ground that the Indian claimants had not established any claim against the Government under either clause (3) or (5) of section 2. We are of the opinion that the Commission's conclusions are justified not only from the evidence adduced, but also from the allegations in the petition which, on their face, fail to state a cause of action on this claim against the Government within the meaning of the Act. Articles X and XI of the 1830 treaty actually represent dealings between the Otoes and certain other Indian tribes whereby they accomplished, with the cooperation of the Government, certain objects which they all desired. Not only is there no evidence, but there is no allegation in the petition, to the effect that the Government induced the Otoes to enter into an arrangement which they now consider to have been detrimental to their best interests. From all that appears in the petition and in the record, the Indians appear to have known what they were doing and were under no misapprehensions whatsoever. It is not unreasonable to suppose that the Otoes wished to benefit their own halfbreeds and those of friendly tribes by

selling for a nominal sum sufficient land on which those halfbreeds might live. This is quite different from the situation in the Osage [21] case where it was unreasonable to conclude that the Indians would have willingly relinquished property to be used for the benefit of other Indians with whom the Osage were not on friendly terms and would have no reason to wish to benefit.

Nothing in the circumstances of this claim indicates any failure of the Government to act fairly and honorably with respect to Indian appellants. Certainly the Government was under no duty to prevent the Otoes from doing what was a sensible and generous act.

 The Commission also held that as to the 15,697 acres of land omitted from the first survey, the cession of that land to the halfbreeds had been an outright one leaving no remaining property rights in the Otoes, and, accordingly, the Government's action in paying the halfbreeds for the land they did not receive, was proper. We find no merit in Indian appellants' argument that because of the erroneous survey the purpose of the cession failed and left the Government in the position of holding the lands in trust for the grantors, i. e., the Otoes. Title to the land, including that omitted from the survey, was in the halfbreeds upon the ratification of the treaty and there it remained (regardless of the fact that some white settlers came upon it), until the halfbreeds' title to that land was extinguished by later act of Congress.

While the Commission might have disposed of appellant Indians' contentions regarding the 45 acres of land not yet allotted, it seems to us from what has been said that what happened to that land is no real concern of the Otoes but rather of the halfbreeds and therefore the omission cannot be regarded as prejudicial error.

The Commission's final determination of the second cause of action is affirmed.

### Third Cause of Action

Indian appellants' third cause of action is brought under Section 2(3) and (5). In this cause of action the Otoes alleged that under the Treaty of September 21, 1833, 7 Stat. 429, they ceded 792,000 acres of land held by them under Indian title (immemorial possession and occupancy), for an unconscionably low consideration. The Commission held that the Otoes had established Indian title (exclusive possession and occupancy from time immemorial) to the land involved; that the tribe had been paid 4.9 cents per acre for land which was actually worth 75 cents per acre, and concluded that such consideration was unconscionable and for that reason the Otoes were entitled to an award in the net amount of $554,589.85, less allowable offsets.

The Government has appealed from this determination on the grounds, (1) that the Commission did not have jurisdiction under the Act to entertain this cause of action because the claim involved original Indian possessory title land; (2) that the evidence failed to establish Indian title (exclusive possession) in claimants, and (3) that the land was worth far less than 75 cents per acre.

We have hereinbefore fully discussed and disposed of the Government's first jurisdictional ground for appeal. In support of its second ground, the Government urges that the Commission's findings of fact are meager and wholly inadequate to support the ultimate findings and conclusion that the Otoes at the time of the treaty of cession and from time immemorial had had exclusive possession and occupancy of a definable area. The Government does not show in what respect it considers the findings meager and inadequate. It says only that the Commission's conclusion concerning exclusive use and occupancy of a definable area is unsupported by the record, mentioning specifically the testimony of

21. Osage Nations of Indians v. United States, 97 F.Supp. 381, 119 Ct.Cl. 592, certiorari denied 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672.

Government's witness, Mrs. Wedel. The Government also lays stress on the fact that Article I of the 1833 treaty gives no western or southern boundary to the cession. In this connection, it should be noted that the parties entered into a stipulation and agreement fixing the boundaries of the land covered by this cession and also by a later cession in 1854, and the Commission relied on these stipulations, as it had a right to do, in finding the area which the treaty purported to cede.

Having found the area which the parties intended to cede in the 1833 treaty, the Commission then found that the claimants actually possessed, used and occupied this area from time immemorial to the time of the cession to the exclusion of other Indians. The findings indicate that the Commission relied on data in connection with the halfbreed cession in 1830 and the cession covered by the Treaty of March 15, 1854, supra, and the supplemental Treaty of December 9, 1854, 10 Stat. 1130. The Commission also relied on evidence that no other tribes claimed or used the areas ceded by the treaties and that neighboring tribes recognized these lands as being the exclusive property of the claimants. The Commission specifically referred (finding 13) to the report of Commissioner Ellsworth, who negotiated the 1833 Treaty, in which he stated that he had found exclusive Indian title to the land ceded to be good in the claimants.

The Commission also relied on and made findings on the basis of expert testimony by Dr. B. B. Chapman, a well-known historian in the field of American History, and a recognized authority on the land tenure of the Otoe and Missouria tribe. The Commission's finding that the claimants actually occupied the area in question to the exclusion of other Indians is amply supported by Dr. Chapman's evidence and other evidence. The Commission also refers in its findings (finding 13) to statements of George W. Manypenny, Commissioner of Indian Affairs, and James M. Gatewood, Indian Agent, concerning the exclusive occupancy ownership of the Otoe and Missourias of the land in question.

A careful study of the record on this cause of action reveals that it contains substantial support for the findings of the Commission and little, if any, support for contrary findings. More detailed findings might have been made on this claim, but we think that those made were adequate and sufficient to indicate the basis for the Commission's ultimate finding of Indian title in claimants to a defined area of land. In making its findings the Commission did take into consideration every essential part of the record on this claim, and defendant's citation of Snake or Piute Indians of Former Malheur Reservation in Oregon v. United States, 112 F.Supp. 543, 125 Ct. Cl. 241, is inapposite.

The Commission found that the lands involved in the 1833 cession were worth 75 cents per acre in 1833. Defendant contends that this valuation is in error and that in any event there are no primary findings of fact sufficient to indicate the basis on which the Commission arrived at this valuation.

Under the principles discussed in this court's decision in the Snake or Piute case, supra, finding 14 concerning value is an ultimate finding without a full statement of subsidiary findings of the primary facts. The Snake decision supra, was, however, issued several months after the Commission's decision in the instant case. In the recent decision by the Commission in the case of The Osage Nation of Indians v. The United States, Docket No. 9, August 13, 1954 (3 Ind.Cl.Com. 217), the Commission has made comprehensive and detailed findings of the primary facts supporting ultimate findings of the value of land. In the Snake case the Commission was furnished with adequate proposed findings by the claimant. In the instant case, the proposed findings submitted to the Commission on value are practically useless in the light of the standard followed in the Osage case.

In view of the above circumstances, we have reviewed the evidence of record

**290**

on value submitted by the parties in order to determine whether or not further primary findings on that evidence would support the ultimate finding made by the Commission. Cf. Fletcher v. Fletcher, D.C.Cir., 219 F.2d 768. We are of the opinion that the evidence of record fully supports the Commission's findings on the question of value of the land.

The Government's evidence of value of the lands in question is derived from the testimony and report of John Muehlbier, Agricultural Economist of the United States Department of Agriculture. The evidence prepared and submitted by the Government's witness was in support of the Government's contention that the only cognizable value of Indian land ceded at a remote time and in an area not yet open to public sale or settlement, is "market value" notwithstanding the fact that under the circumstances there could be and was no actual market in the sense contended by the Government. He made a study of the so-called use value of the land and concluded that on that basis the land was worth from two to fourteen cents per acre. He arrived at this conclusion by estimating the money value of the Indians' subsistence derived from such land, the proportion of gross income that could be attributed to the land, the rate of capitalization, the number of persons in the tribe, and the acreage claimed as hunting grounds.

As noted by the Government in its appeal, the Commission obviously rejected the valuation method proposed by the Government and relied on the method urged by the Indian claimants in arriving at the determination that the land had a value of 75 cents per acre at the time it was ceded.

The method of valuation proposed by the Indian appellants is along the lines adopted by this court in many cases and in particular in Alcea Band of Tillamooks v. United States, 87 F.Supp. 938, 115 Ct.Cl. 463, reversed as to interest, 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738, Rogue River Tribe of Indians v. United States, 89 F.Supp. 798, 116 Ct.Cl. 454, certiorari denied 341 U.S. 902, 71 S.Ct. 610, 95 L.Ed. 1342. The same method of valuation was followed by the Indian Claims Commission in the Osage case (3 Ind.Cl. Com. 217). In those cases the court and the Commission rejected the notion that the value of Indian lands must be based on market value alone because the market for such lands was absolutely controlled by the only possible purchaser, i. e., the Government either direct or in trust for sale. Until Indian title to an area of land is extinguished and the land is surveyed, no sales thereof or settlements thereon are possible.

In the instant case the surrounding lands were not open to settlement because the Government had not yet extinguished Indian title thereto. But that does not mean that such land was worth no more than the value of the subsistence it provided for the Indians. In the absence of a market at the time in question, and therefore the absence of evidence of "market value" in the conventional sense, this court and the Commission have taken into consideration numerous other factors in determining the value of lands ceded by the Indians. The Indian appellants' expert witness, Thomas H. LeDuc, took those other factors into consideration in giving his opinion of the value of the ceded lands. For the most part the factors were the same as those relied on by the Commission in its recent Osage findings, and follow, to some extent, the pattern laid down in the Alcea and Rogue River decisions in this court. This method of valuation takes into consideration whatever sales of neighboring lands are of record. It considers the natural resources of the land ceded, including its climate, vegetation, including timber, game and wildlife, mineral resources and whether they are of economic value at the time of cession, or merely of potential value, water power, its then or potential use, markets and transportation—considering the ready markets at that time and the potential market. LeDuc concluded that the land ceded in 1833 was worth not less than $1.50 per acre.

We think that the factors taken into consideration by claimants'

expert witness were valid factors in the determination of the value of Indian lands under the circumstances of this case and similar cases. We believe that the results of such consideration will more nearly accomplish the fair settlement of these claims desired by Congress than the "subsistence" approach advocated by the 'Government. Values cannot be determined on the basis of berries and wild fruits. In the Alcea case, the Supreme Court had an opportunity to reject the method of valuation used by the Commission in this case, but it confined its consent to review, in view of the consent to sue given by Congress, to the question of an additional allowance by way of interest and refused to review the question of valuation.[22]

If the Commission had made detailed evidentiary findings on the basis of the evidence of value submitted by claimants, we are of the opinion that such findings would have supported its ultimate finding that the land ceded in the treaty of 1833 was then worth 75 cents per acre. What has been said is not to be taken as a statement that this court would necessarily have come to the same conclusion as the Commission, but rather that the Commission's conclusion is based on substantial evidence contained in the whole record and that primary findings adequate to support its ultimate finding could have been made on such whole record. Accordingly, we affirm the Commission's final determination concerning the Third Cause of Action.

### Fourth Cause of Action

Under this cause of action the Indian appellants claimed that pursuant to the Treaty of March 15, 1854, 10 Stat. 1038, they ceded 1,250,000 acres of land in Nebraska for a consideration that was either unconscionable within the meaning of clause (3) of section 2 of the Act, or was sufficiently less than the true value of such land as to represent dealings less

than fair and honorable on the part of the Government under clause (5).

The Commission held that the Indian appellants had good original Indian title to the land ceded, that the land was worth $1.00 per acre, and that the consideration paid of 42 cents per acre was, if not unconscionable, at least sufficiently inadequate to represent dealings less than fair and honorable on the part of the Government. Both parties have appealed from this determination.

The Government's first ground of appeal, that the claim is not maintainable under section 2 of the Act because the land was held by Indian title, has already been disposed of.

The Government's second ground of appeal is that the Commission's finding that the Indian appellants had good Indian title is not supported by substantial evidence. Our review of the whole record persuades us that the Commission's findings are based on substantial evidence.[23]

The Government and one of the Commissioners object to the finding of the amount paid by the Government as consideration for the cession because (1) of the failure to determine how much of the cash paid was for the relinquishment of the Indians' claims *east* of the Missouri River, and (2) because of the majority's treatment of the reservation of 162,107.-71 acres ultimately assigned to the Otoes in the Supplemental Treaty of December, 9, 1854, 10 Stat. 1130.

The Treaty of March 15, 1854, provided for a cession by the tribe to the United States of what the parties have agreed was approximately 1,250,000 acres of land in Nebraska held by the tribe by Indian title. Article 1 of this treaty provided for the setting aside of a reservation 10 miles wide and 25 miles long, which, according to the description in the treaty and contemporaneous maps in evidence, lay within the outer limits of the

---

22. United States v. Alcea Band of Tillamooks, 340 U.S. 873, 71 S.Ct. 121, 95 L. Ed. 635.

23. As in the third cause of action, the parties have stipulated as to the area ceded.

larger area ceded and located in the southwest corner thereof. On October 23, 1854, George Hepner, Indian Agent of the Council Bluffs Agency, wrote to Col. H. Cumming, Superintendent of Indian Affairs at St. Louis, concerning a trip he had just made to examine the reservation carved out of the cession by the March 15th treaty. He stated that the reservation was in an unsuitable location for the tribe because it had insufficient timber for their needs and "because they will be more exposed to the attacks of their enemies there than they would be on the opposite side, the river forming a barrier." Other documents in evidence show that following the 1833 cession, the Otoes had become more sedentary in their mode of life and had taken up farming; that they were frequently attacked by the Sioux and did not always receive the protection they had been promised by the Government. A location for their reservation which would provide natural protection from invaders was of the utmost importance. Accordingly, the Supplemental Treaty of December 9th was negotiated, and under its terms they were given a reservation to the south of the March 15th cession. The reservation was the same size as that provided for in the earlier treaty and was located on the boundary of Kansas and Nebraska, a small strip of the reservation being in Kansas.

The parties agree that both the reservation originally intended for the Otoes within the boundaries of the March 15th cession, and the reservation actually granted to them by the December 9th treaty, consisted of 162,107.71 acres. As a result of the two treaties, the Otoes ceded to the United States 1,250,000 acres of their land and the Government granted to the Otoes 162,107.71 acres of public land in the same vicinity. The Commission upon all the evidence considered all of this land to be worth, as Indian title land, on the average of $1.00 per acre. The evidence in the whole record supports this valuation. This would mean that if the Otoes had received what the land was worth as Indian title land in that area at

that time, they would have received $1,-250,000, less the $463,423.74 (the cash payment provided for in the treaty), and less the value of the reservation land to the south of the cession granted to them in December 1854, having a value of $162,107.71, making a total received of $625,531.45. Accordingly, the Commission correctly concluded that under the treaty, the Otoes received $624,468.55 less than they were fairly and justly entitled to for the cession of the 1,250,000 acres of land in 1854.

The Government and the dissenting Commissioner object to the majority of the Commission's assignment of $1.00 an acre as the value of the December 9th grant of the 162,107.71 acre reservation, and note that no specific proof was offered by the Indians as to the value of that land in 1854. On the basis of the whole record, including the testimony of Mr. LeDuc, the assignment by the Commission of $1.00 an acre to this tract does not appear to be arbitrary. The land included in this tract appears to have been of the same character as that included in the cession a few miles to the north, and we believe the Commission was justified in concluding on the record that it had the same value.

As to the value to be assigned to the Otoe's cession and relinquishment of its rights east of the Missouri River, the Commission was of the opinion that no significant part of the consideration paid under the March 15, 1854 treaty was for such relinquishment and the Commission attributed none of the consideration paid as in payment for such rights or claims. In view of the state of the record on this point, we cannot say that the Commission was wrong.

On the question of value, the Government contends that $1.00 an acre is too much and the Indians urge that it is too little. The Indians' expert, LeDuc, was of the opinion that the land was worth from $2.00 to $5.00 an acre. The Government expert was of the opinion that the land was worth from 10 cents to 49 cents per acre. On the basis of the whole record, we think the Commission's

finding that the land was worth $1.00 per acre to be supported by substantial evidence.

The Government has objected to the Commission's holding that if this disparity of more than fifty percent between the value of the land at the time of cession and the consideration paid does not in law amount to unconscionable consideration, it at least represents lack of fair and honorable dealings on the part of the Government. The petition before the Commission states this cause of action in the alternative and the Commission, apparently in doubt concerning the unconscionable consideration claim, was not uncertain that the claimants had made out a cause of action on the fair and honorable dealings claim. In finding 13 the Commission refers to the circumstances under which the 1854 treaty was negotiated. The record on this point reveals that the tribe was impoverished and demoralized by the constant encroachment of white settlers on their lands and by the repeated attacks from the Sioux, against neither of which the Government had provided the promised protection. The Commission believed that a certain amount of duress was practiced on the tribe in the negotiation of the treaty and the record supports that belief and the resulting conclusion that the whole transaction, including the surrounding circumstances and the inadequate consideration, does not comport with fair and honorable dealings on the part of the Government.

Both appeals are hereby denied and the final determination of the Commission on this cause of action is affirmed.

### Fifth and Sixth Causes of Action

The Fifth cause of action involves the sale by the United States of 119,846.17 acres of land off the west end of the reservation granted to the Indian appellants under the Treaty of December 9, 1854, 10 Stat. 1130, discussed in the fourth cause of action.

The Act of June 10, 1872, 17 Stat. 391, provided that with the consent of the Otoe and Missouria Indians, expressed in open council in the usual manner, the Secretary of the Interior was authorized to cause to be surveyed a portion of the Otoe and Missouria reservation from the western part thereof; that the lands so surveyed should be appraised by three competent commissioners, one to be selected by the tribe and two appointed by the Secretary of the Interior; that thereafter, the Secretary was authorized to offer the lands for sale for "cash in hand"; that sealed proposals, duly invited by public advertisement, should be received for tracts not exceeding 160 acres each, and also for the whole body of land; that the Secretary was also authorized to accept a proposal for the entire tract, or the highest bids for separate tracts, whichever should be best for the Indians. The Act also provided that no bids could be accepted for less than the appraised value nor less than $1.25 per acre. The Act provided for the placing of the proceeds to the credit of the Indians with interest at five percent per annum, except what was needed for the use of the Indians; that not more than twenty-five percent of the principal received from the sales could be spent in any one year; that no sale should be approved unless the *average* sale's price of each parcel should be at least $2.50 per acre.

On August 15, 1876, 19 Stat. 208, Congress passed an act providing that with the consent of the Otoe and Missouria Indians, expressed in open council, the Secretary of the Interior was authorized to have the lands surveyed; that thereafter the lands should be appraised and 120,000 acres from the western end of the reservation offered for sale for "cash to actual settlers only," in tracts not exceeding 160 acres to each purchaser. The Act then provided that if the Secretary deemed it more advantageous to sell the lands upon *deferred payments,* he might, with the consent of the Indians expressed in open council, sell such lands for one-third in cash, one-third in one year, and the remainder in two years from the date of sale, with interest at six percentum per annum; that none of the land should be sold for less than the appraised value

and in no case for less than $2.50 per acre. The Act also provided that the expenses of the sale should be paid out of the proceeds.

On March 3, 1879, 20 Stat. 471, Congress amended the Act of August 15, 1876, to provide that when an actual settler, wishing to purchase a tract, applied for something slightly more than the 160 acres permitted, his application should not be rejected on account of such excess; that bona fide claimants then occupying the lands under the 1876 Act might, in the discretion of the Secretary of the Interior, be allowed additional time for making the deferred payments, not exceeding one year on each payment so required to be made.

The lands in question were appraised at an average value of $3.56 per acre and were sold for an average price of $3.85 per acre.

Indian appellants alleged that the retrictions concerning the sale of the lands were inserted in the three above acts for the sole benefit of the Government and its white citizens, and that they tended to discourage and prohibit the purchase of the lands by investors (as distinguished from actual settlers) who might have paid more for the lands; that the lands were not advertised for sale, as required by the Act, but preference was given to persons already on the lands to purchase the lands at their appraised value. The Indian appellants also alleged that their consent to the provisions of the above acts was not freely given but rather was procured by duress as evidenced by the fact that at that time white settlers had encroached on the reservation making the Indians' possession untenable and forcing them to agree to the terms proposed by the Government; that the restrictions imposed on the sales set forth in the three acts were unfair to the Indians and resulted in their receiving unconscionable consideration since the lands were worth far more than the appraised value. This claim is asserted under clauses (3) and (5) of section 2.

The sixth cause of action concerns the sale of the remainder (eastern portion) of the 1854 reservation pursuant to the Act of March 3, 1881, 21 Stat. 380, which contained substantially the same provisions as did the acts relating to the sale of the western portion of the reservation including the provisions for deferred payments. The Indian appellants made the same contentions regarding these sales which were at twice the amount of their appraised value [24] of approximately $6.

The Commission, dismissing both causes of action, noted that the appraised values were agreed to by the appraiser selected by the tribe and that the same appraiser was selected for both tracts. The Commission found that the evidence in the record did not support the allegation of duress and that in view of the fact that the land sold for more than the appraised value in all instances, the consideration was not unconscionable. We think the Commission was right in its conclusions. The fact that the four acts in question may have been beneficial to the Government and its settler-citizens does not mean that it was not also beneficial to the Indians, and, under all the circumstances, it appears that the Indians were benefited. The Commission also concluded that the Indians' consent was secured in open council as the acts required, and that there were no irregularities in violation of the acts' provisions as would invalidate the sales made thereunder.

We hold the Commission's findings and determinations on these causes of action to be supported by substantial evidence and they are accordingly affirmed.

### Seventh Cause of Action

In this cause of action the Indian appellants claimed that the Government, by fraud and duress, induced the Indians to

---

24. The lands were sold for an average of $12.22 per acre. Indian appellants contend they could have brought $15.23 per acre under less restrictive sales provisions.

enter into a compromise settlement on November 20, 1899, with certain delinquent purchasers of land sold pursuant to the 1881 Act, supra, whereby $168,784.08 due and owing by these purchasers of certain land was forgiven. This cause of action is urged under section 2 clauses (3) or (5).

The purchasers of the land in question were in default in their payments to the extent of $288,583.08 and it was their position that the land had been sold to them at prices far in excess of its actual value (this land was sold for twice the appraised value on the average), and that in fairness and equity the contracts of sale should be adjusted and rebates or reductions granted. By the Act of March 3, 1893, 27 Stat. 568, the Secretary of the Interior was duly authorized by Congress to revise the contracts of sale if the Indians consented to such revision. After prolonged negotiation, a compromise settlement was agreed to by the Indians and the purchasers, on November 20, 1899, and it was thereafter ratified by Congress on April 4, 1900, 31 Stat. 59.

The Indian appellants contend that the settlement was executed in an irregular way by the tribe and not in formal council, and that the United States Indian Inspector, James McLaughlin, was guilty of highly questionable conduct. The record does not support this contention.

The settlement provided that the delinquent purchasers might have the land at the appraised value plus 25 percent thereof, plus annual interest at five percent from the time of the purchase, and for the immediate payment of the purchase price on the basis of such revised sales price.

The Commission held that despite any irregularities which may have occurred in procuring the consent of the Indians to the settlement, the agreement was signed by three-fourths of the adult members of the tribe, though not in council; that the settlement was not for the benefit of the Government but for the mutual benefit of the Indians and the purchasers and was an agreement between them and not between the Indians and the United States. The Commission found that it was not established that the Indians were deceived or misled by the United States agent, and under the resulting agreement the Indians received more than the price which their own appraiser had deemed fair.

The evidence regarding this claim was assembled by Indian appellants' expert witness, Dr. B. B. Chapman (Plaintiff's Exhibit 47), in a thorough and painstaking report. A study of that report reveals that due to a conspiracy of cattlemen and speculators, the price of the lands in question was "rigged" at the public sales; that several sales had to be held; that in spite of every effort on the part of the Government agents conducting the sales, many bona fide settlers had to bid prices far in excess of the fair market value of the land in order to secure the land; that on the occasion of some sales, members of the conspiracy paid prospective purchasers not to bid so that the lands could be secured at low prices by persons who wished to graze cattle thereon for limited times and intended to default in payment when the land had served their purposes. It appears from the record that the Government did its best to carry out its obligations to the Indians and also to the bona fide settlers. The report describes the successive crop failures between 1894 and 1899 which made it difficult and at times impossible for some of the settlers to keep up their payments. During all this time there was constant pressure from some of the delinquent purchasers to revise the purchase contracts so that they would not have to pay the amounts still due. On several occasions the Indians agreed to settlement proposals submitted to them by the Government, but the delinquent purchasers refused to agree. Finally the settlers were persuaded to agree to the compromise in question, and it was submitted to the Indians in open council by the Government inspector. The Indians did not agree to the settlement at that council which was accord-

ingly adjourned for a few days. Being persuaded that the settlement represented the best terms for the Indians that the delinquent purchasers would agree to, and also that the Congressional representatives of the delinquent purchasers would never permit a forfeiture of the lands held by them, the Government inspector spent several days talking to individual Indians and procuring their signatures. The Act of March 3, 1893, does not specify that the consent of the Indians had to be obtained "in open council in the usual manner" as had the acts discussed in the fifth and sixth causes of action, and the Commission concluded that the inspector's method of obtaining the consent was a sufficient compliance with the 1893 Act. In view of the fact that the record establishes that the terms of the settlement were explained to and understood by the Indians in open council, we agree that the inspector's method of securing signatures was not illegal or irregular to such a degree as to nullify the effect of the consent. Congress clearly had the right to legislate in this matter for what it considered to be for the best interest of the Indians. The facts of record show that the Government did not benefit in any way from the settlement and that Congress was attempting to secure for the Indians the best terms possible. It is probably true that the situation requiring such a settlement was brought about by the unscrupulous actions of certain individuals and groups of the Government's white citizens, who consistently brought pressure to bear on certain members of Congress to secure legislation which would benefit their constituents at the expense of the Indians. Their desires, however, were never the desires of the Congress nor of the Department of the Interior. As often happens in a democracy, compromises are sometimes necessary with strong and vocal minorities. In the instant case we agree with the Commission that no unfair or dishonorable motives or conduct can be imputed to the Government, in relation to the compromise settlement agreed to by the Indians and the settlers and ratified by Congress for the best interest of the Indians as the best means of bringing to an end the long controversy over the sale of the reservation lands.

On the whole record we find that the Commission's findings and conclusions are supported by substantial evidence and they are affirmed.

### Government Appeal from the Decision on Offsets

On December 11, 1953, the Commission made findings of fact and rendered a decision regarding offsets. It concluded that the Government was entitled to offset $23,024.05 from the award made to Indian appellants. The Government has appealed on the ground that the Commission erred in concluding as a matter of law that the United States was not entitled to all offsets claimed by it in its amended answer filed May 29, 1953. The United States claimed offsets in the total amount of $139,038.29.

Subsequent to the filing of the appeal in this case, the Court, on April 6, 1954, issued its decision in Quapaw Tribe of Indians v. United States, 120 F.Supp. 283, 128 Ct.Cl. 45, in which the Commission's decision (Docket 14, 1 Ind.Cl.Com. 469) concerning offsets was remanded for further proceedings in accordance with that opinion. In view of the fact that the Commission in the instant case has followed the same general pattern used by it in its decision in the Quapaw case, we believe the interests of justice would best be served by remanding to the Commission its findings and decision on offsets herein for further consideration and whatever proceedings may be necessary in accordance with the principles set forth in this court's decision in the Quapaw case, supra. Accordingly, the Commission's findings and decision on offsets are remanded for further proceedings.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN, and WHITAKER, Judges, concur.