**TLINGIT AND HAIDA INDIANS OF ALASKA**

**v.**

**UNITED STATES.**

No. 47900.

United States Court of Claims.

Oct. 7, 1959.

453

I. S. Weissbrodt, Washington, D. C., for plaintiffs. David Cobb, Abe W. Weissbrodt, Rella R. Shwartz, Washington, D. C., Jay H. Hoag, and Clarence G. Lindquist, Duluth, Minn., were on the briefs.

Ralph A. Barney, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

James Craig Peacock, Washington, D. C., for intervenors.

LARAMORE, Judge.

This is a suit against the United States by the Tlingit and Haida Indians of Alaska.[1] The jurisdictional act[2] under which this suit is brought is set forth in full in finding 1. The act authorizes the court to "hear, examine, adjudicate, and enter judgment upon any and all claims which said Indians may have, or claim to have, against the United States." Section 1 of the act defines the Tlingit and Haida Indians of Alaska as "all those Indians of the whole or mixed blood of the Tlingit and Haida Tribes who are residing in Russian America, now called the Territory of Alaska, in the region known and described as southeastern Alaska, lying east of the one hundred and forty-first meridian." Section 2 of the act describes and defines the claims which are authorized to be submitted to the court for "settlement and determination of the * * * amount equitably and justly due to said Indians from the United States," as (1) all claims, legal or equitable for lands or other tribal or community property rights taken from the Tlingit and Haida Indians by the United States without compensation therefor, or (2) for the failure or refusal of the United States to compensate the claimant Indians for lands or other tribal or community property rights claimed to be owned by the claimant Indians and which property or property rights the United States ap-

---

1. On April 8, 1954, Harry Douglas and 18 others described in their motion papers as chiefs and leaders of various clans of Tlingit Indians were permitted to intervene as parties plaintiff.

2. Act of June 19, 1935, 49 Stat. 388, Ch. 275. Finding 1.

propriated to its own uses without the consent of the Indians, or (3) for the failure or refusal of the United States to protect the interest of the claimant Indians in their lands or in other tribal or community property, and for the loss of the same (a) at the time of the purchase of Alaska from Russia in 1867, or (b) at some later date prior to the passage of the jurisdictional act. The same section provides that the loss to the claimant Indians of "their right, title, or interest, arising from occupancy and use, in lands or other tribal or community property, without just compensation therefor, shall be held sufficient ground for relief hereunder." Section 4 of the act provides, among other things, that it shall be no bar to the suit that the Indians may have been made citizens of the United States or that they may have severed their tribal relations with the Tlingit and Haida Tribes. Section 7 sets forth those Tlingit and Haida Indians who are entitled to share in any judgment of the court and provides for the making of Tlingit and Haida rolls. Section 8 of the act provides for the deposit of the judgment in the Treasury to the credit of each community of Tlingit and Haida Indians, and for the use of such money for the benefit of all the Indians. It also provides that none of the funds recovered or interest thereon may be used for per capita payments.

On February 29, 1956, the court, under Rule 38(b), 28 U.S.C.A., ordered a separate trial be held of the issues relating to the liability of the defendant with respect to (1) whether the claimant Indians had Indian title to the lands and waters claimed in Alaska at the time in 1867 when Alaska was purchased by the United States from the Russians, and if so, the extent of land and waters so owned; (2) whether the plaintiffs' Indian title rights in the land and waters were taken or impaired by the United States in 1867, or (3) assuming plaintiffs had Indian title to lands and waters in Alaska in 1867 and thereafter, and such rights survived and were not later abandoned, whether plaintiffs are entitled to recover under the act. The issue of abandon-

ment of any property or rights therein and the amount of recovery and the amount of offsets, if any, were matters reserved for further proceedings.

After extensive hearings held pursuant to the above order, the Commissioner of the Court made detailed findings of fact concerning the culture and characteristics of the Tlingit and Haida Indians, the manner in which they used and occupied the claimed lands, and the extent and location of the land so used and occupied in 1867 and long prior thereto. Findings 7 through 57.

The Commissioner found that the Tlingit Indians were a homogeneous and interrelated group of Indians speaking a single language different from that of their neighbors; that they were a non-agricultural people who were noted primarily for their use of marine products and wood; that their social structure emphasized formalistic family groups or clans, each clan having rights, respected by other clans, to the use of particular land and water areas of economic importance such as ocean waterfronts, bays, rivers, streams, or inland hunting areas; that the clans were acutely aware of their identity as Tlingit Indians in general and as members of households and clans in particular; that they had no central political body to govern the entire Tlingit people, although collectively they occupied a contiguous stretch of coast on the mainland and adjoining islands and were closely unified by common customs, language, family ties, trade, ceremonials, and a consciousness of their oneness as a homogeneous group. The Haida Indians were also a homogeneous group having customs and modes of life closely resembling those of the Tlingits. The Haidas spoke a different language and did not use the interior of their islands to the same extent that the Tlingits did. Neither the Tlingits nor the Haidas were oganized politically in a manner resembling the tribal organizations of the Indians of the United States, and the relatively large subgroups within each group were not organized politically as are Indian tribes usually. These sub-

groups, sometimes called "tribes" or "kons" by the Indians themselves, took names which had geographical significance, being the name of the river, bay, or island which the particular clan used and occupied. A map introduced in evidence as plaintiffs' exhibit 169 is reproduced herein to show the location of the principal villages of the Tlingit and Haida Indians between 1867 and 1884 and also in modern times, and the areas occupied by the various kons. The somewhat complex social structure of the various divisions and subdivisions of the Tlingit and Haida Indians is described in finding 24.

In general, the Tlingits and Haidas were each divided into two groups or moieties, and each moiety was divided into a number of clans. Membership in a clan descended through the mother, and marriage within the clan or within the moiety was forbidden so that a clan was often distributed or divided among

several villages, some of the larger clans or families being widely scattered throughout southeastern Alaska. Since no one in a clan could marry anyone else from that clan and had to associate with another clan from the opposite moiety, two local clans from opposite moieties settling in a village constituted the closest thing to a "tribe" as that term is known in its usual sense. Usually, however, several local clans would settle in a single village. The villages consisted of large houses in each of which one or more families belonging to the local clans would live, and each house had a local clan designation. Each local clan in a village owned and used, in accordance with the Tlingit and Haida manner, large land and water areas adjacent to the village. The several larger Tlingit and Haida subdivisions which took the names of their principal winter villages are listed in finding 25.

The land and water owned and claimed by each local clan division in a village was usually well-defined as to area and use. Clan property included fishing streams, coastal waters and shores, hunting grounds, berrying areas, sealing rocks, house sites in the villages, and the rights to passes into the interior. Tracts of local clan territory were parceled out or assigned to the individual house groups for use and exploitation and the chief of the local clan, assisted by other house chief elders of the clan, formed a sort of council which controlled the clan's affairs. Smaller areas belonging to a house within a clan remained clan property whenever a house ceased to exist. The modes of living and of dealing with property among these Indians were regulated by rigidly enforced tradition and custom, and, except under special circumstances, there was no authority in a clan or clan division to sell, transfer or otherwise dispose of, in whole or in part, any claimed area of land or water. Land was transferred from one clan to another only as compensation for damages, as gifts in connection with marriages and the like, and such transfers were infrequent. In addition to the areas which were claimed and used exclusively by individual houses, there were certain common areas which could be used by all the clans comprising a particular group of clans residing in a single geographical area. Certain designated offshore fishing and sea mammal hunting areas in larger bodies of water, channels and bays and stretches of open sea could also be used in common by all members of the various clans residing in a particular geographical area, but Indians residing in other geographical areas had no right to such use.

The Tlingit and Haida Indians made extensive use of most of the natural resources of their country, both of the land and sea, including the fish, sea mammals, shellfish, kelp and seaweed, animals, birds, timber, berry bushes, plants and minerals. Finding 33. Prior to our acquisition of Alaska these Indians enjoyed a relatively high degree of civilization, were industrious and prosperous, and the accumulation of surplus wealth was a basic feature of their economy. From their earliest history these Indians carried on extensive trade with each other, with neighboring tribes and later with the Russians and the Americans. Large surpluses of materials were necessary to these people and were regularly accumulated to carry on their trading and also to make possible the yearly traditional ceremonial activities and potlach important to their prestige. The clans and groups which used the mainland were, on the whole, better off materially than the Indians who lived on the islands because the mainlanders controlled the valuable trade carried on with the interior Indians. During the winter months the Tlingit and Haida Indians lived in their permanent villages. In the summer, the Indians went, by family and clan, to their customary summer camps to make use of the fishing, hunting and gathering areas belonging to the house or clan. The riverine clans along the mainland coast were able to secure great quantities of their staple foods for the long winter seasons close to their permanent villages and thus spent longer

periods in their winter or permanent villages than did the other groups. The Indians residing along the coast did more inland hunting and overland traveling than did the groups living on the islands. The mainland Indians hunted large and small land mammals and traded extensively with the Athabaskan Indians, their neighbors to the east. For this purpose they traveled through well defined trails and passes inland for long distances beyond the coastal range of mountains.

The Tlingit and Haida Indians made intensive use of all accessible and usable shore areas within their claimed territories. Closely related to and integrated with their use of the shores, was their use of the waters of southeastern Alaska. In addition to the oceans, bays, inlets, rivers and streams fronting on the shores, and the inland lakes accessible from the shores, the Indians used the inland streams and rivers as means of travel. Even the nonnavigable portions of the streams were useful for access by portage to navigable inland lakes. The waters of southeastern Alaska formed a network of routes for travel by canoe used by the Indians to make their seasonal rounds of fishing, hunting, gathering and trading expeditions, and in the winter months, these routes were used when the clans exchanged visits with each other on occasions of ceremonial feasts. These routes of travel cut deep into the forests and inland reaches of Tlingit and Haida territory and gave the Indians access by water to the greater part of southeastern Alaska.

The Indians used the accessible forests and inland areas of southeastern Alaska for hunting and trapping as well as for gathering roots, berries and other vegetable products. These Indians made extensive use of wood and bark for their houses, canoes and totem poles. Some items, such as lichens used for dye, took the Indians into very high and otherwise barren areas inland.

The social organization, the propensity for trade, and the industrious character of the Tlingit and Haida Indians, impelled them to use to the fullest the many resources available and accessible to them in the claimed areas of southeastern Alaska. The peculiar social structure of their groups rendered their society a highly competitive one in which rank depended in large part on the accumulation, display and disposal of great material wealth. This wealth was secured by fishing, hunting, gathering, and by trade with each other, with neighboring Indians of the interior, and later with the Russian and American traders. The increasing demand by American and European markets, especially for furs, made these Indians exert themselves even more to make heavy use of all of the accessible portions of their territory.

The Commissioner has estimated from all the evidence that the population of the Tlingit and Haida Indians in early historic times was approximately 10,000; that in 1867, it was approximately 6,000, and that at the present time the population is approximately 7,000.

From early times until 1867, and for a number of years thereafter, the Tlingit and Haida Indians made intensive and exclusive use of their territory to the exclusion of other Indians and of white explorers, traders, miners and settlers. There is no evidence of any other native people pressing to move into Tlingit or Haida territory in 1867 or prior thereto. For a number of years subsequent to the purchase of Alaska by the United States in 1867, there were only minor and limited intrusions into this territory by way of a few trading posts established along the coast and the settlement at Sitka.

The record as a whole establishes, and the Commissioner has found, that as of 1867 the Tlingit and Haida Indians exclusively used and occupied all of that area of southeastern Alaska claimed by those Indians and shown on a map introduced in evidence as plaintiffs' exhibit 168 and reproduced herein. In finding 57 the Commissioner described the area so used and occupied from time immemorial and in 1867. In the same finding the Commissioner pointed out certain areas that were not actually used for any

458

productive purpose by the claimant Indians and this aspect of finding 57 has given rise to exceptions by both parties and to a dispute as to the significance of the exclusions or limitations thus made by the Commissioner.

The areas of territory which the Commissioner found were not put to any productive use by the claimant Indians consist generally of inaccessible or useless areas of land located within and completely surrounded by the larger area which was intensively used for productive purposes by the Indians, and also certain inaccessible mountain crests which were useful only as marking the borders of the claimed and used territory and forming a barrier between the claimant Indians and their neighbors to the east. The Commissioner pointed to nonnavigable waters not used by the Indians, glacier areas having no resources of value for the Indians, barren rocky slopes and inaccessible gorges which at places formed impassable barriers to the interior, and high mountain peaks covered by deep snows the year around. The Commissioner did not attempt to estimate the acreage of these barren and inaccessible areas inasmuch as the record does not now afford a basis for making such estimates.

The Government has excepted to finding 57 for the reason that it does not give the precise location or areal estimates of barren, inaccessible land or of inaccessible or unusable waterways, and that, as a result, it is impossible to ascertain from the findings the amount of land and water which was actually used and occupied by the Tlingit and Haida Indians and for which the Government will be liable in the event the court decides that defendant took or failed to protect the interest of the Indians in such land and water. In support of its contention that the findings on the location and extent of land and water used and occupied by the Indians are inadequate, defendant relies on United States v. Seminole Nation, 299 U.S. 417, 57 S.Ct. 283, 81 L.Ed. 316, Causby v. United States, 328 U.S. 256, 66 S.Ct. 1062, 90 L.

Ed. 1206, and United States v. Penn Foundry & Manufacturing Co., 337 U.S. 198, 69 S.Ct. 1009, 93 L.Ed. 1308.

Plaintiffs except to the exclusions contained in finding 57 on the ground that where the record established use and occupany by Indians of contiguous areas which together form a single contiguous territory containing some nonexploitable or inaccessible land and water within the outer boundaries of exploitable and exploited land and water, and where it is obvious, as here, that the Indian occupants of the overall territory exercised dominion and control over the barren and inaccessible areas within their lands to the exclusion of all other Indians, it has been the established practice of this court to consider the entire area as being owned by the Indian claimants. Put another way, plaintiffs urge that the use and occupancy test applied to determine the amount of land used and occupied by a claimant Indian group has never been applied to require a showing of actual exploitation for material resources of each unusable internal tract found to be encompassed within the outerboundaries of an Indian title territory.

Insofar as the past practice in this court and at the Indian Claims Commission is concerned, the accessibility or exploitability test has not been applied to determine the extent of Indian title ownership where the inaccessible or useless areas were encompassed within an overall area found to be actively used and occupied by the claimant Indians. These useless (to the Indians) and sometimes inaccessible areas become important, however, at the valuation stage of proceedings in Indian litigation involving land, and it is at this stage that the land is classified and the barren and inaccessible areas are measured and eliminated from valuation.

In the case of the Uintah and White River Bands of Ute Indians v. United States, 152 F.Supp. 953, 139 Ct.Cl. 1, the Indians sued the United States under a special jurisdictional act for just compensation for the taking of nearly a million acres of land in the State of Utah.

The land was described in the findings as a horseshoe shaped tract surrounded on three sides by mountains "the crest of which was the reservation boundary." The findings of fact noted that some of the mountain crests exceeded 13,000 feet in elevation and that about 90 percent of the lands in suit lay at elevations above 8,000 feet. The upper reaches of the north arm of the horseshoe were rocky barren ridges and peaks rising abruptly from large glaciated basins located high in the Uintah Mountains and much of the land in that north arm was barren and inaccessible. The reservation containing such land had been carved out of a larger territory which the Utes had held by aboriginal use and occupancy title, i. e., Indian title. Uintah Utes of Utah v. United States, 5 Ind.Cls.Comm. 1 (1957). In creating this reservation and defining its boundaries, the parties to the treaty were following a well known custom of giving the area some visible and familiar boundaries such as mountain crests. Obviously the Indians had never used and occupied these high, barren peaks for any productive purpose when the land was held by them under Indian title and they would not use those inaccessible crests in the sense of exploiting them for any productive use once the mountains were included within or as a boundary of the reservation.

Indian lands, prior to the extinguishment of Indian title, were not surveyed. They were not fenced to shut out trespassers or to mark boundaries. But the land which Indian groups claimed and used did have boundaries which were known to them and to their neighbors, and those boundaries were frequently stretches of land useless for any purpose except for serving as markers to define the limits of their land ownership.

In the Uintah case, supra, as in numerous other Indian cases, it is apparent that within the confines of an area of land found to have been used and occupied to the exclusion of all others, there were smaller areas of land or water which were not used for any productive purpose because such areas were not capable of use by the Indians. Such areas might be stretches of desert land or swamps. Furthermore, rivers and streams which criscrossed Indian lands might be used extensively for fishing or travel in those portions which could be used for those purposes, and be largely neglected in those portions not so usable. It has never been supposed that those interior areas of land or those portions of streams and rivers did not "belong" to the tribe which used and occupied in a more active sense the areas completely surrounding them. In the case of Alcea Band of Tillamooks v. United States, 59 F.Supp. 934, 103 Ct.Cl. 494, affirmed 329 U.S. 40, 67 S.Ct. 167, 91 L. Ed. 29, the Indians used the streams which rose in the mountains forming the eastern boundary of their lands only so far as those streams were productive of fish. The crest or summit of the Coast Range of Mountains was "used" by the Alcea only as a boundary marker. The useless portions of their streams were not used by the Alceas. but the Alceas saw to it that no other Indians trespassed in their vicinity, and the summit of the Coast Range was recognized and respected by neighboring tribes as the boundary of the Alcea lands.

Obviously some account must be taken of the amount of barren, useless and inaccessible lands and waters which are encompassed within the area of land exploited exclusively by an Indian claimant group, or which form the borders of their lands. Such account is taken in connection with the valuation of their lands for the purpose of making an award if the court decides that there is liability on the part of the Government. In the past it has been at the valuation stage of the proceedings (where the case has been tried in two stages as here) that the land to be valued has been classified as to types, the amount of acreage of each type estimated as nearly as possible, and no value assigned to land classified as barren and inaccessible. See finding 69 in the Uintah case, supra.

While, in the event of a judgment, the net monetary award would be

the same whether land classification and acreage determination of barren and inaccessible land is undertaken at the liability stage or at the later valuation stage, it seems to us that there are compelling practical reasons for postponing such classification and acreage determination of inaccessible and barren land until the valuation stage of the proceedings. Classification of land types and determination of exact acreage of each type so classified is a matter for experts. It is an expensive and time-consuming matter for both the Indian claimants and for the Government. If the Government is held to be not liable in the suit brought, such classification and acreage proof would be useless since the precise extent and location of usable and non-usable land is not essential to the overall issue of liability. If the Government is held to be liable to the Indians then the proof on valuation will have to include land classification and the elimination from valuation of all areas of barren and inaccessible land and waters which were of no use or value to the Indians.

■ We do not mean to depart in any sense from the rule of long standing that Indian title to lands must be shown by proof of actual use and occupancy from time immemorial. But it is obvious from a study of the many cases involving proof of Indian title to lands both in this court and at the Indian Claims Commission that where the Indians have proved that they used and occupied a definable area of land, the barren, inaccessible or useless areas encompassed within such overall tract and controlled and dominated by the owners of that surrounding land, as well as the barren mountain peaks recognized by all as the borders of the area of land, have not been eliminated from the area of total ownership but rather have been assigned no value in the making of an award, if any, to the Indians.

■ Because of the established practice of this court and the Commission,[3] and also because of the practical considerations mentioned above and the fact that the ultimate monetary result will not be affected by postponing proof of land classification and measuring until the valuation stage of the proceedings, we conclude that failure to prove the precise extent of inaccessible, barren or unused land at this stage is not fatal to the claimants on the issue of liability. We hold that the Tlingit Indians owned by Indian title the area shown on plaintiff's exhibit 168, reproduced herein, and that the Haida Indians owned by Indian title the area indicated on the same map, as of 1867 when the United States acquired Alaska, and for several years thereafter.

3. A similar problem arose in the case of Clyde F. Thompson et al. v. United States, Indian Claims Commission Docket No. 31, and Ernest Risling et al., Docket No. 37, decided July 31, 1959, 8 Ind.Cls. Com. 1, 32, 33. The Commission stated: " * * * It is not necessary that the Indians prove that each of the 500 or more tribelets occupied and used every acre of the lands they claimed; * * *. It must be borne in mind that in aboriginal times these Indians obtained their subsistence from the natural products of the soil and waters of the areas they occupied. Such an economy did not require an intensive cultivation of the soil for the Indians of necessity exploited the places which provided the necessaries of life. The resources the Indians relied upon for subsistence were not uniformly distributed; they were largely seasonal and in scattered places, requiring travel of considerable distances in their gathering, fishing and hunting activities. Game animals moved from place to place in search of food and had to be followed. The importance of flora and fauna in all regions of the state cannot be gainsaid, and the search for such resources was continuous and covered areas that were unproductive as well as those that were, because of the variations in the production of the natural resources from year to year or even from season to season in many years.
" * * * It is no doubt true, as the Government contends, the higher elevations in the mountains and some large desert areas produced little of economic importance to the Indians, but such places had limited uses and were a part of the areas claimed and defended when necessary by the tribelet occupying it."

Before passing to the matter of whether or not the Government took the property of the Indian claimants or refused or failed to protect their rights in such property, we consider the Government's contention that under a proper interpretation of the special jurisdictional act these Indians may not recover in any event. Defendant urges that because neither the Tlingit nor Haida Indians were organized politically as a "tribe," they could not have owned any "tribal or community property" within the meaning of the jurisdictional act [4] which uses those precise terms to describe the property which may be made the basis of suit. Defendant does not contend that these Indians are not authorized to bring suit under the act because they did not constitute a tribe or tribes, but merely that they cannot recover because they were not a tribe or tribes and therefore did not own land and property as tribes. Defendant relies on the rule of statutory construction which requires that special jurisdictional acts permitting suit against the sovereign be strictly construed against the party so authorized to sue. Schillinger v. United States, 155 U.S. 163, 15 S.Ct. 85, 39 L.Ed. 108. It is true that the jurisdictional act refers to "lands or other tribal or community property rights" and neither the Tlingit nor Haida Indians were organized politically as tribes for the purpose of owning land or for any other purpose.

A similar argument concerning statutory construction of a statute enlarging the Government's consent to be sued was made by defendant in the case of Otoe and Missouria Tribe of Indians v. United States, 131 F.Supp. 265, 131 Ct.Cl. 593, certiorari denied 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755. The subject matter of some of the claims sued on in that case was Indian title land and the Government argued that because section 2 of

the Indian Claims Commission Act, 25 U.S.C.A. § 70a, did not specifically mention Indian title land as a basis for a claim under the act, such land could not be made the subject matter of a suit brought under that act, citing the Schillinger case, supra. The claimant Indians in that case argued that because the Indian Claims Commission Act was remedial legislation it should be liberally construed in favor of the class it was intended to benefit and in the light of the injustices it was intended by Congress to correct. The court discussed the various rules of statutory construction and interpretation urged by the parties and noted that the Act was in the nature of a special jurisdictional act in that it broadened the Government's consent to suit and was thus in derogation of its sovereignty; that it conferred special privileges upon Indian claimants apart from the rest of the community and was to some extent in derogation of the common law; that, on the other hand, it was remedial legislation in that it was intended to remedy defects in the common law and in preexisting statutory law affecting Indians, and was designed to correct certain injustices of long standing which were well known to Congress, such injustices having to do, among other things, with the manner in which the Government dealt with the Indians concerning land they held by Indian title. The court then stated at page 271, of 131 F.Supp. at page 602, of 131 Ct.Cl.:

"Fortunately, under these circumstances, rules of interpretation and construction are subordinate to the principle that the object of all construction and interpretation is the just and reasonable operation of the particular statute, and accordingly it should be possible to construe the statute liberally to effect its remedial

4. Section 2 of the special jurisdictional act authorizes the bringing of suit by the Tlingit and Haida Indians of Alaska on all "claims of whatever nature, legal or equitable, which the said Tlingit and Haida Indians of Alaska may have, or claim to have, against the United States, *for lands or other tribal or community property rights*, taken from them by the the United States without compensation therefor * * *." [Italics supplied.]

462

purposes and intent, and strictly to limit undue abrogation of fundamental rights or to prevent undue extension of extraordinary remedies."

Resorting to the legislative history of the Indian Claims Commission Act, the court concluded that Congress had intended that Indian title lands should be the basis of claims brought under the Act.

In the instant case the special jurisdictional act, read as a whole and in the light of its legislative history, reveals that Congress was fully aware of the fact that the Tlingit and Haida Indians did not have the sort of tribal organization which the Indians of the United States had. Congress knew that despite this fact, each was a homogeneous group of Indians having its own language and customs. Congress knew that these Indians did not own land as the Indians of the United States owned lands, that is, as a tribe, but rather that land was held by them more as white people own land, although even in the case of the Tlingits and Haidas, land was not owned by individuals but by family groups and clans. The fact that the United States never attempted to make treaties with these Indians is not significant since shortly after the acquisition of Alaska from Russia in 1867, Congress enacted the Act of March 3, 1871, 16 Stat. 544, 566, prohibiting any further dealings with Indians by treaty.[5]

When Congress was considering the special jurisdictional act under which this suit was brought it knew that the claimants were urging that land, fishing, hunting and timber rights, which were claimed or owned by individual families or clans of the Tlingit and Haida Indians had been taken from them leaving these people with barely sufficient resources on which to exist. One of the early bills considered by Congress (S. 1196, 72d Cong., 1st Sess.) provided that not only could tribal and community claims be adjudicated by the court, but also individual claims for the loss of property and property rights, and it also provided that any award should be distributed per capita. In a report on this legislation prepared by the Department of the Interior it was suggested that these two provisions be eliminated and the claims be treated as though they were tribal claims despite the lack of a true tribal political organization in either group of Indians and despite the fact that the land was owned by smaller family or clan groups. It was also suggested that any award should be made for the benefit of each group as a whole and apportioned to the several Tlingit and Haida communities, rather than for the individual members or families in the groups. The report [6] gave the following reasons for the suggested amendments:

" *  *  * the resources treated in the bill are capital resources, serving at a former time to maintain the entire native population and, before the advent of the white man were available for the use of successive generations. Therefore, I argue that the equivalent of these resources if and when restored to the natives should be in the form of capital for the permanent benefit of the natives concerned. *  *  * I therefore suggest that an amendment be submitted providing for a "tribal" fund to be used to secure such permanent productive "tribal" assets as may be decided upon by the Indians concerned and by the Commissioner of Indian Affairs."

5. The Act provides:
" *  *  * That hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty: *  *  *."

6. See House Report No. 621, 74th Cong., 1st Sess., to accompany H.R. 2756, p. 3. The memorandum to the Commissioner of Indian Affairs by Mr. Paul E. Gordon, director of education for Alaska, transmitted by the Secretary of the Interior in a letter incorporated in the House Report, is in evidence as plaintiff's exhibit 114.

In accordance with the above suggestions Congress eliminated individual claims from the act and prohibited the making of any per capita payments from the award, if any, granted by the court.[7]

■■ Thus it is clear from the legislative history of the special jurisdictional act that when Congress used the terms "tribal or community property rights" in the act it intended to refer to property and property rights which belonged to the claimants as they were defined in the act which claimants Congress understood were not organized as a tribe or tribes and did not own property as a tribe or tribes. To say that Congress authorized nontribal Indians to sue in connection with a type of property right which Congress knew they did not have, i. e., tribal property, is to say that Congress knowingly performed an absurd and useless act in enacting the special jurisdictional legislation. And this brings us to another well known rule of statutory construction which is that it is the duty of courts to give to acts of Congress an intent which does not result in an absurdity if that is at all possible. Jennings v. United States, Ct.Cl., 168 F.Supp. 781, and cases cited therein. We have no difficulty in concluding that in enacting the special jurisdictional act under which this suit is brought, Congress intended that the Indians identified in section 1 should be allowed to sue for and recover judgment for the loss of property or rights in property which belonged to them in the manner in which they owned land and property; and that when Congress employed the word "tribal" to describe the property which should be the basis of suit under the act, it did not use the word in its usual sense. Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226.

Defendant next contends that if the court should hold that the act permits local clans or families to sue and recover for land or property lost because of the acts of the Government, then the plaintiffs may not recover because the Commissioner has not found the well defined hunting, fishing and gathering areas used by each clan. Inasmuch as the judgment, if any, is not to be paid to individuals or families or clans but rather is to be deposited in the Treasury for the benefit of the several communities of Tlingits and Haidas listed on the roll provided for in section 7 of the jurisdictional act, and since the Commissioner has found that in the case of each group the clan holdings formed one contiguous and well defined area, the extent of individual or family or clan holdings of land and water areas is not a matter of importance. The map introduced in evidence as plaintiffs' exhibit 169 and reproduced herein shows the locations of the various communities and the areas of land and water claimed and used by each.

■ The Commissioner has found and we have adopted his findings that the use and occupancy title of the Tlingit and Haida Indians to the area shown on the map reproduced herein was not extinguished by the Treaty of 1867 between

7. Section 8 of the jurisdictional act provides:

"The amount of any judgment in favor of said Tlingit and Haida Indians of Alaska, after payment of attorneys fees, shall be apportioned to the different Tlingit and Haida communities listed in the roll provided for in section 7 in direct proportion to the number of names on each roll, and shall become an asset thereof, and shall be deposited in the Treasury of the United States to the credit of each community, and such funds shall bear interest at the rate of 4 per centum per annum, and shall be expended from time to time upon requisition by the said communities by and with advice and consent of the Secretary of the Interior, and under regulations as he may prescribe, for the future economic security and stability of said Indian groups, through the acquisition or creation of productive economic instruments and resources of public benefit to such Indian communities: *Provided, however*, That the interest on such funds may be used for beneficial purposes such as the relief of distress, emergency relief and health: *Provided further*, That none of the funds above indicated or the interest thereon shall ever be used for per capita payments."

the United States and Russia, 15 Stat. 539, nor were any rights held by these Indians arising out of their occupancy and use extinguished by the treaty. The negotiations leading up to the treaty and the language of the treaty itself show that it was not intended to have any effect on the rights of the Indians in Alaska and it was left to the United States to decide how it was going to deal with the native Indian population of the newly acquired territory.

We next turn to the question whether, subsequent to 1867, the United States did or failed to do anything that interfered with or deprived the Indians of their property or any interests which they had in such property, giving rise to an action which the jurisdictional act has authorized this court to hear and adjudicate.

For approximately 17 years after the United States acquired Alaska, the Tlingit and Haida Indians continued to use and occupy their traditional areas without molestation or restriction. Between 1867 and 1877 the Army of the United States was in charge of the administration of Alaska and Army posts were established at Tongass, Wrangell and Sitka. When the Indians first learned that Alaska had been sold to the United States they objected and advised the United States officials that the Russians had lived in Alaska territory only with the permission of the natives. The behavior of the Government officials and the few white traders and settlers during the early years gave the Indians no cause for alarm and the trade which developed between the Indians and the whites was greatly to the material advantage of the Indians. On rare occasions Army officers found it necessary to call together influential members of clans in order to keep peace within the Indian groups and between the Indians and the whites. During the Indian wars in Idaho, Alaska was virtually without a government. In 1879 the United States Navy took over the civil and military government of southeastern Alaska with headquarters at Sitka.

In 1877 the first fish cannery was built at Klawak. Soon another cannery was built at Sitka and miners began working Schuck Creek at the head of Wyndham Bay. In 1879 a factory for the extraction of oil and the manufacture of fertilizer was built at Killisnoo. American traders came in boats to trade with the Indians of southeast Alaska during the summer months, the fur trade being the principal intercourse between the Indians and white people. In 1880 the Chilkat chiefs agreed to allow white miners to pass through their lands in order to prospect for gold and in that same year gold was discovered in considerable quantities at Rockwell, now known as Juneau, in Tlingit territory. In 1881 Commander Henry Glass persuaded the Indians living in the vicinity of Rockwell to move out of the town and the miners and white men who had settled there raised a sum of money to pay the Indians compensation for their land and for damages.

In 1883 a number of new fisheries were started by white settlers and a large fishing station was opened at Pyramid Harbor. At about this time the timber resources of the area were beginning to attract attention. Although the Indians were beginning to be concerned about the increasing number of white people settling in their lands, the actual interference with their way of life was not considerable and they were reluctant to antagonize the Navy which had burned two or three native winter villages as punishment for Indian crimes against the white settlers.

Up to 1884 the land laws of the United States had not been extended to the territory of Alaska and although settlers and miners filed claims to the land they had preempted in the Customhouse in Sitka, they were unable to secure legal title to the land. On May 17, 1884, Congress passed the Organic Act of Alaska, 23 Stat. 24. Section 8 of that Act provided that Alaska should be a land district and that a land office for the district should be located at Sitka; that the laws of the United States relating to

*mining claims* should be in full force and effect in the district which would be administered under regulations to be made by the Secretary of the Interior. It provided that persons who had already located mines or mineral privileges or who had occupied and improved claims should not be disturbed in such claims but should be allowed to perfect their titles to the claims by payment; that land, up to 640 acres in each instance which had been occupied as missionary stations among the Indians should be continued in such occupancy until Congress should take further action. The act provided that the general land laws of the United States were not being put in general effect in Alaska.

With respect to the Indians inhabiting Alaska, the Organic Act provided, in Section 8, as follows:

" * * * That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation *or now claimed* by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress: * * * ." [Italics supplied.]

Section 12 of the Organic Act provided that the Secretary of the Interior should arrange for an investigation into the condition of the Indians of the Territory and for the making of a report on them and what lands, if any, were to be reserved for their use, what provision should be made for their education, and what rights by occupation of settlers recognized, for the purpose of helping Congress to decide what limitations or conditions to impose when the land laws of the United States were extended to Alaska.

Thereafter, in the subsequent administration of the Organic Act of 1884 and in the rulings of the United States Land Office, miners were permitted to locate, work, perfect and patent mining claims in areas which the Tlingits and Haida Indians had aboriginally used and occupied. The saving provision of the act relating to Indian rights in the land they occupied and claimed was applied only to protect them from the extension of mining claims in areas where the Indian permanent villages existed or other areas which were actually and visually occupied and improved by individual Indians. Other areas of Indian use and exploitation were not protected.

In 1885 the Report authorized by the Organic Act was made concerning the Indians of Alaska. The Report recommended that they should have deeds to the land they actually used and occupied and that they should be secured in the use of their fishing sites. The Report also recommended that the Indians be given the same right to acquire land as the white people had. It was recommended that the timber lands of Alaska which were largely inaccessible at that time be opened for sale in large tracts for a small price. Nothing was said about any possible Indian claim to these timber areas. It was recommended that coal lands also be sold at low prices. The Report did not recommend the preserving to the Indians of areas traditionally used for hunting, fishing and gathering, it being assumed that these areas would be opened for white settlement and exploitation.

Between 1884 and 1891 patents and legal title could only be secured to cover mineral claims and there was much agitation on the part of settlers to have the land laws of the United States extended to Alaska so that fishing claims and home sites as well as town and industrial sites might be legally patented to the squatters who had taken them over. Such claims were filed in Sitka and they did have some effect since, after filing, most settlers and the Indians felt the claims were good against all but the Government and that at any time the land laws would be extended to Alaska and such claims would then be validated.

By 1889, 11 sawmills and 36 salmon canneries were in operation in southeastern Alaska. Fishing stations were located by whites at every point affording a good supply of fish. As a result of this

**466**

activity, the Indians were having a difficult time securing enough fish for their own use, game was largely frightened away, and there was little work for Indians in the canneries which imported Chinese workmen. In 1890 the Indians of southeastern Alaska secured the services of an attorney who wrote to the President concerning their problems. From then on the Indians made claims and protests over their treatment and the rapidly diminishing state of their land and water holdings. They finally asked that they be given a reservation and the protection of the Government. There was little official response to repeated protests and requests for help and the official policy of the Government seemed to have been to ignore the claims of these Indians arising from the aboriginal use and occupancy of southeastern Alaska and instead to create a situation in which the Indians would be forced to assimilate into the white man's society and system of property ownership.

On March 3, 1891, Congress enacted a law (26 Stat. 1095) which dealt a severe blow to any hopes the Tlingits and Haidas might have had of regaining their lands. The Act permitted Alaskan lands to be entered for townsite and industrial site purposes and it exempted from the operation of the law only Indian lands to which the Indians had prior rights by virtue of "actual occupation." The Act gave the United States the power to regulate the taking of salmon from Alaskan waters. It provided that the cutting of timber, which had previously been prohibited, might be done for agricultural, mining, manufacturing and domestic purposes under Department of Interior regulation. No mention was made of any rights claimed by the Indians in land bearing timber. Section 15 of the Act set apart and reserved the Annette Islands in Tlingit territory as a reservation for the use of a group of Christian Tsimshian Indians who had formerly resided in British Columbia and had squatted on the Islands with their British leader, William Duncan. The

reservation, known thereafter as the Metlakahtla Indian reservation, was administered by the Secretary of the Interior and became very prosperous. It was probably the success of this reservation which prompted the Tlingits and Haidas to ask that they be given a reservation where they could develop their own fishing, mining and timber industries unmolested by the white settlers and used under the protection of the Government.

The Act of May 14, 1898, 30 Stat. 409, extended the homestead laws of the United States to Alaska. Homesteaders were allowed to take up 80 acre tracts and the Secretary of the Interior was authorized to reserve for the use of the Indians suitable tracts of land along the waterfront of any stream, inlet, bay or seashore for "landing places for canoes and other craft used by such natives," thus giving some sort of recognition to the fact that the Tlingit and Haidas were still living on the land bordering the waters mentioned. No provision was made, however, to protect the land holdings or water rights of these Indians.

By the Act of June 6, 1900, 31 Stat. 321, the United States laws relating to mining claims and mineral locations were extended to Alaska. Again the Indians were to be protected only in lands "actually in their use or occupation" and by that time it must have been apparent to Congress that the administrative interpretation of such language, which had appeared in prior acts, meant only village and home sites in intensive daily use, excluding hunting, fishing and gathering areas which these Indians had once used to the exclusion of all others.

Section 24 of the Act of March 3, 1891, supra, authorized the President to set apart and reserve public lands bearing forests as public reservations. By presidential proclamations issued on August 20, 1902, on September 10, 1907, and on February 16, 1909, some 16,000,-000 acres of Tlingit and Haida lands were set apart and reserved as the Tongass National Forest, exempting from

such reservation only lands which had already been patented or disposed of pursuant to public land laws applicable to Alaska. Pursuant to the Act of June 8, 1906, 34 Stat. 225, some 2,297,598 acres of Tlingit land in the northern part of southeastern Alaska was, by Presidential proclamation of February 26, 1925, set apart as Glacier Bay National Monument.

The special jurisdictional act now before us authorizes these Indians to bring suit against the United States on all claims, legal or equitable, which they may have for lands or other tribal or community property rights "taken from them by the United States without compensation therefor," and that the loss to the Indians of their right, title, or interest, "arising from occupancy and use," in such lands or other tribal or community property without just compensation therefor, shall be held by this court to be sufficient ground for relief under the act. The act also authorizes the claimant Indians to bring suit on all claims which they may have arising out of the failure or refusal of the United States to protect their interests in land or other tribal or community property in Alaska and for the loss of the use of such property.

█ The events described above as taking place between 1884 and 1900 do not, except for the setting apart of the reservation on the Annette Islands, represent any outright takings by the United States of Tlingit and Haida land or property rights. However, the manner in which the Government officials administered the Organic Act of 1884, and the actual provisions of subsequent legislation relative to land in Alaska, made it possible for white settlers, miners, traders and businessmen, to legally deprive the Tlingit and Haida Indians of their use of the fishing areas, their hunting and gathering grounds and their timber lands and that is precisely what was done. These Indians protested to the Government and their protests went unheeded. They had no weapons with which to combat Navy gunboats which

had burned their villages when they attempted to take the law into their own hands. Although these Indians were relatively civilized, were excellent fishermen and hunters and were noted for their industry, they had no conception of how to start a modern fishing industry, to build canneries, to harvest lumber on a large scale, or to file claims in Sitka for town and industrial sites. Whenever white settlers and businessmen entered their lands for the purpose of settlement or exploitation, the Indians were forced to move out. The new industries in their lands did not employ them, preferring imported Chinese labor. The game which had been abundant in the area was driven off by the large settlements and industrial enterprises. The amount of salmon and other fish taken from the streams and waters by the new white fishing industries and canneries left hardly enough fish to afford bare subsistence for the Tlingits and Haidas and nothing for trade or accumulation of wealth. Thus it seems clear that the United States both failed and refused to protect the interests of these Indians in their lands and other property in southeastern Alaska within the meaning of section 2 of the special jurisdictional act and that the United States is liable under such act to compensate the Indians for the losses so sustained.

The major part of the lands aboriginally used and occupied by the Tlingit and Haida Indians in southeastern Alaska was actually taken from them by the United States without the payment of any compensation therefor. The land so taken was, first, some 86,740 acres comprising the Annette Islands in the southern part of Tlingit territory taken as a reservation for the Tsimshian (Metlakahtla) Indians pursuant to the Act of March 3, 1891; next, some 16,000,000 acres of Tlingit and Haida lands set aside by the Government in 1902, 1907 and 1909 as the Tongass National Forest; and finally, approximately 2,297,598 acres of Tlingit lands set apart by the Government as the Glacier Bay National Monument in 1925, pursuant to the Act

of June 8, 1906, 34 Stat. 225. See Confederated Bands of Ute Indians v. United States, 100 Ct.Cl. 413. In none of the acts authorizing the setting apart of these lands as public reservations was there any recognition of the Tlingit or Haida rights of use and occupancy although the rights of white settlers in the areas were protected. These acts on the part of the Government represent takings of land and water aboriginally used and occupied by the Tlingit and Haida Indians for which they are entitled to compensation under the terms of the jurisdictional act.

The record indicates that part of the land set aside as the Glacier Bay National Monument may have been previously included in the Tongass National Forest, but that matter as well as the extent and location of all the lands which these Indians lost, as well as their value at the time of loss or taking, will be determined in further proceedings.

The most valuable asset lost to these Indians was their fishing rights in the area they once used and occupied to the exclusion of all others. The plaintiffs have suggested that since the effective exploitation of their fisheries was dependent upon their continued occupancy and use of the shore lands, the fishing rights might be considered in the nature of easements fixed in such lands. Viewed in this way, they could be considered as having been lost or taken as of the dates on which the shore areas were lost or appropriated, and the value of the fishing rights can be considered in determining the value of the land areas to which they were attached as of the date of the taking or loss of the land areas. The same will be true of lands which were valuable to the Indians for hunting and gathering, or from which they took limited amounts of minerals or timber.

In addition to the amount of recovery and offsets which have been reserved for further proceedings, the order of the court issued February 29, 1956, reserves also the issue of voluntary abandonment of lands included in the area found to have been aboriginally used and occupied by the claimant Indians in 1867 and thereafter. The plaintiffs contend that the findings of the Commissioner are sufficient at this stage to establish the fact that there was no abandonment of any part of the area claimed. Inasmuch as this issue was reserved for further proceedings and the Government has indicated that it intends to offer proof on the issue, we will not pass on plaintiffs' arguments at this time.

In conclusion, we hold that the plaintiffs have established their use and occupancy, i. e., Indian title, of the lands and waters in southeastern Alaska shown on the map, marked plaintiffs' exhibit 168 and reproduced as a part of this opinion; that they were using and occupying that land according to their native manner of use and occupancy in 1867 when the United States acquired Alaska from Russia; that following the purchase of Alaska in 1867 these Indians continued to exclusively use and occupy the same areas of land and water as previously, and that such use and occupancy was not interfered with by the United States or its citizens until 1884; that beginning in 1884 and continuing thereafter, these Indians lost most of their land in southeastern Alaska through the Government's failure and refusal to protect the rights of the Indians in such lands and waters, through the administration of its laws and through the provisions of the laws themselves; that a large area of land and water in southeastern Alaska was actually taken without compensation and without the consent of the Indians, through Presidential proclamations issued pursuant to law, and through reservation of part of the land for Canadian Indians under the Act of March 3, 1891. The plaintiffs are entitled to recover for all usable and accessible land which they used and occupied, and the amount of such recovery and the amount of offsets, if any, and the issue of voluntary abandonment or relinquishment of any areas

are reserved for further proceedings in accordance with the order of the court issued February 29, 1956.

It is so ordered.

WILBUR K. MILLER, Circuit Judge, sitting by designation, JONES, Chief Judge, and MADDEN and WHITAKER, Judges, concur.